It was in evidence on the trial that a few days before the dog died the defendant applied to one Doctor Keigh for poison to kill a dog, (283) and procured from him a quantity of nux vomica, with directions to administer it in corn meal; that Mrs. Terry, at whose house the dog was in the habit of staying, went on a visit to the house at which the defendant boarded and the dog followed her; that soon after she got there the defendant came in, went up stairs and came down with a cup in his hand, apparently having corn meal in it; that about one hour afterwards Mrs. Terry, upon returning home, found the dog in convulsions and he soon died, exhibiting all the appearances of having been poisoned; that the defendant, a day or two afterwards, being informed by Dr. Keigh that the plaintiff had inquired of him whether he had sold poison to any one to kill dogs, stating that his dog had been poisoned, said that he would not have cared if the Doctor had told the plaintiff all about it; and said also that he had folded one dose of the poison in a paper and wrote upon it "dog poison," and put it in the crack of a fence. It was also in evidence that the defendant, on one occasion, when the dog barked and jumped at him, at Mrs. Terry's house, where he was in the habit of visiting, flew into passion and swore that if the dog ever bit him he would kill him, and finally said "he would kill him anyhow." It was proved further that the dog was the property of the plaintiff and was valuable as a guard and yard dog on account of his watchfulness and propensity to bark.
For the defendant it was proved that this dog on one occasion entered the lot of one Aldy, in Waughtown, and took therefrom one hen egg in Aldy's presence, who hotly pursued him; that afterwards when Aldy was *Page 225 
passing by Mrs. Terry's the dog barked at him and made a grab at his heel, but fled upon Aldy's turning upon him; that upon another occasion he jumped at the horse of Dr. Keigh. That on another occasion a dog, which the witness believed to be this dog, was found upon a sheep about a mile from Waughtown; that Snider, the owner of the sheep, being informed of it went to the plaintiff and told him of it, whereupon the plaintiff called up his dog and he had no signs of having been engaged in killing sheep. Plaintiff then said that he supposed it must be a younger dog which he owned that was seen upon the sheep, as the young dog was of the same color with the old dog, and was (284) at the time missing; and plaintiff said further that although the old dog when young was guilty of running sheep, yet he had not done so for several years.
The defendant's counsel insisted, first, "that the action should have been case and not trespass vi et armis; secondly, that as the dog was guilty of sucking eggs, killing sheep, and barking and jumping at the good people of Waughtown, any person was justified in killing him." The plaintiff's counsel contended "that the action was well brought, and that although Aldy or Snider might well have justified killing the dog if taken in the act of sucking the egg of the one or killing the sheep of the other, yet the defendant was not the avenger of every hen's nest and sheep fold in Stokes county."
His Honor charged the jury "that if they were satisfied from the evidence that the defendant had killed the plaintiff's dog by throwing poison to him or putting it down where he knew the dog would pass along and get it, the plaintiff was entitled to recover so far as the form of the action was concerned, but if defendant had put the poison in the crack of a fence and the dog had casually passed by and got it, the defendant was entitled to a verdict, as the action should then have been case."
As to the second point his Honor charged "that although the dog had stolen the egg and caught the sheep and had the other bad habits stated by the witnesses the defendant was not justified in killing him; that the bad habits of the dog, however, should be taken into consideration in arriving at the amount of damage if they found for the plaintiff, and they might also take into consideration the circumstances of the trespass as the use of poison."
The defendant's counsel then moved the court to charge that as the dog was not proved to be of any certain value, if the jury should think from the evidence that the dog was of no value, they should find for the defendant. His Honor refused so to charge, but told the jury that when a man committed a trespass by killing the dog of another and was not justified in so doing, the law implied that some damage was sustained by *Page 226 
this violation of his rights, however small, and the jury should so find. The plaintiff had a verdict and judgment, and the defendant appealed.
We are of opinion that, with a single exception, all the objections taken to the charge of the judge must be overruled. It was not necessary for the maintenance of the action that the plaintiff's dog should be shown to have pecuniary value. Dogs belong to that class of domiciled animals which the law recognizes as objects of property, and whatever it recognizes as property it will protect from invasion by a civil action on the part of the owners. It is not denied that a dog may be of such ferocious disposition or predatory habits as to render him a nuisance to the community, and such a dog, if permitted to go at large, may be destroyed by any person. But it would be monstrous to require exemption from all fault as a condition of existence. That the plaintiff's dog on one occasion stole an egg, and afterwards snapped at the heel of the man who had hotly pursued him flagrant delicto — that on another occasion he barked at the Doctor's horse, and that he was shrewdly suspected in early life to have worried a sheep — make up a very catalogue of offenses not very numerous nor of a very heinous character. If such deflections as these from strict propriety be sufficient to give a dog a bad name and kill him, the entire race of these faithful and useful animals might be rightfully extirpated.
In that part of the charge which relates to the form of the action, we do not entirely concur with his Honor. We hold with him that if the poison had been directly administered (and the throwing it down to the dog mixed up with food is a direct administration of the poison), either by the defendant or by any other person under his direction, the action of trespass was the proper remedy. But we do not assent to the position that "if it were put by the defendant in a place where he knew the dog would pass and get at it," and the dog afterwards passed by and swallowed the poison, the action of trespass might also be maintained. The distinction between injuries which are the proper subject of an action of trespass and those which are to be redressed by an action on the (286) case, between injuries immediate, and injuries consequential, is sometimes very subtle and attenuated. But the law makes the distinction, and the ministers of the law must follow it out. Acts which are of themselves invasions upon the person or property (in possession) of another, are of the first class or immediate injuries. Acts which by reason only of subsequent occurrences, occasion an injury to the person or property of another, which injury was either foreseen or ought to have been guarded against, are the subject of an action by the party *Page 227 
grieved, because of this consequent injury, and come under the second class. One of the most apt as well as ordinary illustrations of the legal distinction is thus stated. If A throw a log in the highway and it hits B, he may maintain trespass; but if B come along afterwards and fall over it, and thereby receive an injury, the remedy is case. Nor in the instance last put will it make any difference whether at the time the log was thrown it was or was not known that B was shortly thereafter to pass along and in all probability would stumble over it. There are, indeed, some instances where, although the injury be immediate, it may be alleged as a consequence of negligence or inattention, and the action on the case be maintained. But we know of none where the injury is entirely an indirect consequence of a previous act, in which it may be complained of as a trespass with force and arms.
For this error we feel ourselves obliged to reverse the judgment rendered below and order a venire de novo.
PER CURIAM. Judgment reversed.
Cited: S. v. Lathan, 35 N.C. 34; S. v. Boon, 49 N.C. 468; Morse v.Nixon, 51 N.C. 294; Mowery v. Salisbury, 82 N.C. 117; S. v. Neal,120 N.C. 619.
(287)