## STATE v. MOORE.

(Filed September 18, 1901.)

1. INDICTMENT—*Sufficiency—Larceny—Arrest of Judgment —Insufficient Ground—Meat.*

> Where an indictment charges the larceny of various articles, judgment will not be arrested, or the indictment quashed, because the indictment includes meat, not the subject of larcency.

2. INDICTMENT—*Sufficiency—Quantity—Value.*

> An indictment for larceny and for receiving stolen goods is not defective because it fails to charge the quantity and separate value of each article.

3 EVIDENCE—*Admissibility—Trailing by Bloodhound.*

> The evidence in this case of the trailing by a bloodhound should not have been admitted.

INDICTMENT against Amos Moore and others, heard by Judge *A. L. Coble* and a jury, at April Term, 1901, of the Superior Court of PITT County.

The defendants, Amos Moore, Ashley Dixon, Jesse Edwards and Joseph Edwards, were tried and convicted upon the following bill of indictment, viz:

"The jurors for the State, upon their oath, present: That Albert Rountree, Amos Moore, Ashley Dixon, Jesse Edwards, Joseph Edwards, John Smith, late of Pitt County, on the 9th day of February, 1901, with force and arms, in said county, 50 lbs. of meat, 20 lbs. flour, 10 lbs. sugar, 4 boxes tobacco, 6 pair drawers, 6 undershirts, of the value of $50, the goods and chattels of J. C. Gaskins, then and there being found, then and there feloniously did steal, take and carry away, against the form of the statute in such case made and provided, and against the peace and dignity of the State.

"And the jurors aforesaid, upon their oath aforesaid, do further present, that on the day and year aforesaid, in said

county, the said Albert Rountree, Amos Moore, Ashley Dixon
Jesse Edwards, Joseph Edwards, John Smith, the said meat,
flour, sugar, tobacco, drawers, undershirts, of the value of
fifty dollars, the goods and chattels of J. C. Gaskins, then and
there being found, feloniously did have and receive, well
knowing the same to have been feloniously stolen, taken and
carried away, contrary to the statute in such case made and
provided, and against the peace and dignity of the State."

In apt time defendants' counsel moved to quash; motion
overruled, and defendants excepted. After verdict, they
moved in arrest of judgment upon the following grounds:
(1) That it appeared upon the face of the bill of indictment
that there was a fatal defect in the first count, in that it
charged the larceny of 50 pounds of meat, 20 pounds of flour,
10 ponds of sugar, 4 boxes of tobacco, 6 pairs of drawers, 6
undershirts, and also that it failed to state the value of each
article which it alleges to have been stolen; (2) that the sec-
ond count charges that the defendants received the said meat,
flour, sugar, tobacco, drawers and undershirts, without speci-
fying the quantity and value of each article.    Which mo-
tion was overruled, and defendants excepted.

The State then introduced Albert Rountree, an accom-
plice, who testified that defendants and himself committed
the crime; that on the night of the store-breaking and lar-
ceny, the defendant Jesse Edwards broke the first window of
the store with a piece of scantling, and then ran across the
bridge; that witness was, at the time of the breaking, stand-
ing near the store; that defendants Ashley Dixon, Amos Moore
and Joseph Edwards were outside of the store; that Jesse
Edwards came back and went into the store through the win-
dow; that no one went into the store except Jesse Edwards;
that Jesse Edwards came out with a sack on his shoulder,
divided up what he had in his sack, and gave witness a sack
of flour, and divided out the things among the others, and
then he left and did not know what became of the others.   It

was also in evidence that the next morning several persons, including Moore and Dixon, went to the store and walked around and inside, viewing the premises from which the articles were stolen.

In order to corroborate the witness Rountree (whose evidence was impeaced by reason of confession of guilt, and in whose possession alone stolen goods were found, and which was further impeached by reason of his admission upon cross-examination, that after his arrest on Wednesday following, and before he confessed, the magistrate, Sam Laughing-house, before whom he was taken for trial, gave him whiskey, and told him they would turn him loose if he would tell on the other boys; and that Gaskins, the prosecuting witness, had told him afterwards, while in jail, to stick to what he had said, and gave him ten cents in money and some tobacco, and promised him more money if he would stick to what he had sworn to in the magistrate's court), the State introduced, after exception by defendants, the conduct of a dog, called a bloodhound, as testified to by Brinson and Gaskins: That sometime during the next day Brinson arrived from Kinston with his dog, and carried him to the window, where he smelt in a basket, and was then carried inside, where he smelt at the window, and around the counters, and when he reached the meat-block, he barked, and then went to the back door and smelt the steps and went to the creek eighteen or twenty feet away and barked and came back, and then trailed about the door and steps and up the street, going into divers places, and finally went up to Dixon, one of the defendants, and bayed him, and then trailed about, and afterwards went up to defendant Moore and bayed him. It was also in evidence that said Moore and Dixon were present all the while in the crowd while the dog was trailing, and frequently near the dog. And that the other two defendants, Jessee and Joseph Edwards, were also there in the crowd near the dog at the time.

STATE v. MOORE.

After verdict of guilty, defendants moved for new trial, assigning, among others, as error the admission as evidence the conduct of the dog, either to establish a circumstance or to corroborate Rountree. Motion overruled, and defendants appealed.

. *Robert D. Gilmer, Attorney-General,* for the State.
*Swift Galloway* and *A. M. Moore,* for the defendants.

COOK, J., after stating the case. While the bill of indictment is inartificially and carelessly drawn, yet no such defect appears upon its face as would authorize the Court in quashing it, or arresting judgment after verdict.

In the first count, several articles are alleged to have been stolen, and the valuation placed upon them all is fixed at fifty dollars. Among the articles appears one not the subject of larceny, "meat," but all the others are, and are of substantial value; to all or any one of which, if shown to have been stolen, the valuation assigned would attach, and proof of larceny of any one is sufficient (*State v. Martin,* 82 N. C., 672). In the second count, the same articles are alleged to have been received, and the same valuation assigned, but the quantity and number of pounds are not stated. Defendants' contention upon that point can not be sustained, because the quantity does not enter into the element of the crime, nor could it in any way prejudice the defendants' defense. So, it is held that charging the larceny of a "parcel of oats" is sufficiently certain (*State v. Brown,* 12 N. C., 138).

We think the objection taken to the introduction of the conduct of the dog should have been sustained by his Honor, and that he erred in admitting it as evidence. We do not base our opinion upon the ground that the dog, being an animal of instinct and not possessed of reason, and *ergo* his

32——129

conduct would not be a circumstance to be considered in con-
necting a person with an act, or in corroborating a statement
made by a witness, but upon the ground that we fail to see
that it was a circumstance which would tend to connect the
defendants with the larceny, or that it in any way corrobo-
rated the testimony of the witness Rountree. It is a matter
of common knowledge that there are many breeds of dogs
endowed with special traits and gifts peculiar to their re-
spective kind—the pointer and setter take instinctively to
hunting birds; the hound to foxes, deer and rabbits, but we
know of no breed which instinctively hunts mankind. Yet
we know that dogs are capable of running the tracks of human
beings, as is frequently evidenced by the lost dog trailing his
master's track long distances and through crowded streets, and
finally overtaking him, which demonstrates the further fact
that some distinctive peculiarity exists between different per-
sons which can be recognized and known by a dog. And it
is a well-known fact that the bloodhound can be trained to
run the tracks of strangers; and in this the "training" con-
sists only in being taught to *pursue* the *human* track; the
gifts or powers or instincts being already inherent in the
animal, he is induced to exercise them under the persuasive
influence and protection of his trainer or master. Once
trained in this pursuit, we must assume that his accuracy
depends not upon his training, but upon the degree of capacity
bestowed upon him by nature. Experience and common ob-
servation show that among dogs of the full blood and full
brothers or sisters, one or more may be highly proficient,
while others will be inefficient, unreliable and sometimes
worthless; some may be acute to scent, while others will be
dull to scent and incapable of running a "cold" track. Then
again we may find the most reliable and favorite hound taking
the "fresher" track which crosses his trail, or quitting the
"cold" trail of a fox and following the "hot" track of a deer

which he may strike. Likewise, the pointer or setter may abandon a "cold" trail of a covey of birds and follow a "warmer" one upon which he may happen to run. Or the squirrel dog may leave the tree at which he has taken his stand and barked, and go to another, or quit entirely. So it does no violence to common experience to assume that dogs are liable to be deficient in their instincts. Therefore, we frequently hear huntsmen speak of some dogs as "true" and 'staunch," while others will be denounced as unreliable or "liars." It sometimes happens that the best-trained foxhounds will lead their master into a rabbit chase, or a pointer will hold his master with trembling excitement while he "points" a terrapin.

Applying common knowledge and experience, of which the Court is justified in taking notice, in connection with the evidence, to the case at bar, we are led to consider whether there is any evidence tending to show that Brinson's dog pursued either one of the tracks made upon the premises at the time of the commission of the crime. After scenting at the window and in and around the store and upon the steps leading to the ground, he went eighteen or twenty feet to the creek and then barked and turned back, which is understood by all followers of hounds to mean that he found he was going the wrong direction, or the track was so "cold" he could not follow it, or that he was scenting for a track and had failed to find one. In either event, it fails to be any evidence that Jesse's track had been identified, or that the dog had discovered any track at all, or, if he had detected a track, it would not follow that it was not made by some person other than Jesse. And if it be that he did discover a track, and it was too "cold" to follow, a like condition would exist as to the tracks of others made at or about the same time.

This incident tends rather to discredit than corroborate Rountree, for he said Jesse went across the bridge, while the

dog went eighteen or twenty feet to the creek. Had the dog been trailing Jesse's track, and had Jesse crossed the bridge, the dog would also have gone there and taken the track back, provided it had not been too "cold" to follow; or, if for any reason he had lost the trail, having once positively identified Jesse's track, then surely Jesse would have been the person recognized and bayed by the dog, to the exclusion of others; while, on the contrary, he bayed two of the persons who did not go in the direction of the creek or bridge (or if they did, there is no evidence of it), and who were shown to have been on the premises, whence the trail was made, that morning a few hours before the dog arrived, and it is not improbable that, had he been pressed or urged, he would have identified each and every one of the persons present at the store that morning.

This is a novel feature of evidence in our jurisprudence, and is attended with some danger, and is calculated to excite the superstition of some people that the exercise of that instinctive power, not possessed by human beings, is a supernatural agency in the aid of human justice, to which too great importance may be attached, and against which Courts will have to guard when the occasion arises

There are only three cases cited by the Attorney-General (and we are satisfied that had there been others they would not have escaped his diligent eye) in which the conduct of a dog has been used as evidence. One is *Hodge v. The State,* 98 Ala., 10, in which it appears that tracks of a peculiar character, and easily identified, were found near the rear of the house in which the murder was committed; that a dog trained to follow human tracks was put upon them, and trailed by him to defendant's house; that the tracks found at the house of deceased were followed by several persons to the defendant's house, being measured at various points along the route, and at each of such points, identified as being made by

the same shoes as were the tracks at the place of murder, and that the route thus traced by them was precisely that taken by the dog throughout, and when the defendant was soon captured he had on shoes that made tracks precisely corresponding to those traced by the dog. In that case the Court held that the conduct of the dog was competent to go to the jury for their consideration, in connection with all the other evidence, as a circumstance tending to connect the defendant with the crime.

In another case, *Pedego v. Com.*, found in 44 S. W. Rep., 143, from Kentucky, the Court held, Guffy, J., dissenting, "That in order to make such testimony (the trailing of a track by a dog) competent, even where it is shown that the dog is of pure blood, and of a stock characterized by acuteness of scent and power of discrimination, it must also be established that the dog in question is possessed of these qualities, and has been trained or tested in their exercise in the tracking of human beings, and that these facts must appear from the testimony of some person who has personal knowledge thereof. We think it must also appear that the dog so trained and tested was laid on the trail, whether visible or not, concerning which testimony has been admitted at a point where the circumstances tend clearly to show that the guilty party has been, or upon a track which such circumstances indicated to have been made by him. When so indicated, testimony as to trailing by the bloodhound may be permitted to go to the jury for what it is worth, as one of the circumstances which may tend to connect the defendant with the crime of which he is accused. When not so indicated, the trial Court should exclude the entire testimony in that regard from the jury."

The third is *Simpson v. State,* 20 Southern Rep., 572 (an Alabama case), in which the evidence of trailing by the dog was admitted without objection.

In this case, there is no evidence to connect the circumstance of the baying of the two defendants, or either of them, with the making of tracks at the time the larceny was committed; nor is there any evidence that the dog scented any that were then made by either of the defendants; nor is there any way to ascertain that fact.

The evidence admitted failing to become a circumstance to connect the defendants with the crime, and failing to become a circumstance in corroboration of Rountree's testimony, there was error in admitting it, and there must be a

New Trial.