STRONG *v.* GEORGIA RAILWAY AND ELECTRIC COMPANY.

SIMMONS, C. J. 1. This case is controlled by the decision of this court in the case of *Jemison* v. *Southwestern Railroad,* 75 *Ga.* 444, holding that a suit can not be maintained against a railroad company for the negligent killing of a dog.

2. As the rule announced in the above-stated case has stood as good law since December 1, 1885, and the General Assembly has passed no act changing the same, this court is of opinion that the rule should not be now changed by overruling that case. *Judgment affirmed.* *By five Justices.*

Argued July 7, — Decided August 13, 1903.

Action for damages. Before Judge Lumpkin. Fulton superior court. December 19, 1903.

The action was for the negligent killing of the plaintiff's dog by a car of the defendant. A general demurrer to the petition was sustained, and the plaintiff excepted.

*George Gordon,* for plaintiff.
*Rosser & Brandon* and *W. T. Colquitt,* for defendant.

COBB, J., concurring. I concur in the judgment and in the rulings made, to the effect that the present case is controlled by the case cited in the headnote, and that this case should not now be overruled. The silence of the General Assembly for eighteen years is indicative of the legislative policy on the subject of the status of the dog in this State, so far as the liability of railroad companies is concerned. The question as to how far the dog shall be treated as property has been the subject of numerous decisions in the different courts of this country. See the very elaborate monograph note, in 40 L. R. A. 503, to the case of *Graham* v. *Smith,* 100 *Ga.* 434. See also the note in 37 L. R. A. 659, to the case of St. Louis Ry. Co. *v.* Stanfield, 63 Ark. 643. The trend of modern decisions seems to be in favor of treating the dog as property to the same extent that other domestic animals are treated. Speaking alone for myself, I see no good reason why the dog should not have the same

status before the law as the hog, the barnyard fowl, or any other domestic animal usually found about homes and farms. The present able and learned judge of the Atlanta circuit had before him recently the question as to whether a dog could be seized on execution. While the case did not reach this court, our attention has been called to an interesting opinion filed in the case, which bears evidence, not only of the usual learning and research of that judge, but also of the fact that he is not unable to deal with the subject of the dog in a sentimental way. I take the liberty of attaching hereto extracts from this opinion:

"The dog has figured very extensively in the past and present. In mythology, as Cerberus, he was intrusted with watching the gates of hell; and he seems to have performed his duties so well that there were but few escapes. In the history of the past he has been used extensively for hunting purposes, as the guardian of persons and property, and as a pet and companion. He is the much valued possession of hunters the world over, and in England especially is the pack o' hounds highly prized. In literature he has appeared more often than any other animal, except perhaps the horse. Sometimes he is greatly praised, and at others greatly abused. Sometime he is made the type of what is mean, low, and contemptible; while at others he is described in terms of eulogy. Few men will forget the song of their childhood, which runs:

> 'Old dog Tray's ever faithful;
> Grief cannot drive him away;
> He is gentle, he is kind;
> I'll never, never find
> A better friend than old dog Tray.'

"Nor can any of us fail to remember the intelligent animal on whose behalf 'Old Mother Hubbard went to the cupboard.'

"Few men have deserved and few have won higher praise in an epitaph than the following, which was written by Lord Byron in regard to his dead Newfoundland: 'Near this spot are deposited the remains of one who possessed beauty without vanity, strength without insolence, courage without ferocity, and all the virtues of man without his vices. This praise, which would be unmeaning flattery if inscribed over human ashes, is but a just tribute to the memory of Boatswain, a dog who was born at Newfoundland, May 3, 1803, and died at Newstead Abbey, November 18, 1808.'

"The dog has even invaded the domain of art. All who have seen Sir Edwin Landseer's great pictures will know how much human intelligence can be expressed in the face of a dog. His picture entitled ' Laying Down the Law ' will not be forgotten in considering the dog as a litigant.

"Thus the dog has figured in mythology, history, poetry, fiction, and art, from the earliest times down to the present, and now in these closing days of the nineteenth century we are called upon to decide whether a dog is a wild animal (feræ naturæ) in such sense as not to be leviable property; or, if he is a domestic animal (domitæ naturæ), whether he is not subject to levy on the ancient theory that he had no intrinsic value if he was not good to eat.

" Originally all the animals which are now used by man were wild. One after another they have become domesticated, and subject to his control, ownership, and use. As time progressed they gradually lost their character of wildness, and became more and more subject to mankind, and more and more regarded as ordinary property. At this day no one would contend that the horse was not the subject of absolute property because his ancestors were originally wild; and the same may be said of other animals now thoroughly recognized as domestic. Even in the days of Blackstone, while it was declared that the property in a dog was ' base property,' it was nevertheless asserted that such property was sufficient to maintain a civil action for its loss. (4 Bl. Com. 236.) Since that day, in the evolution of civilization, the dog has not been left behind. He is now not only prized for hunting purposes, as a watchdog, and as a pet, but it is common knowledge that many dogs have an actual commercial and market value. When annually there is held in New York a bench show, at which dogs take prizes amounting to thousands of dollars, and where they are bought and sold at prices which are frequently far larger than are paid for ordinary horses, it is rather late in the day to assert that they are not valuable property.

"Dogs are also trained for purposes of exhibition, being sometimes the sole means of support of their masters. It would be an interesting survival of archaic law to say that a showman could put up his tent, give nightly exhibitions of his valuable dogs, making large sums of money from them, get in debt to any given extent, laugh at his creditors, and proceed with his daily exhibitions,

on the ground that his stock in trade is not subject to levy. If it be contended that the horse, mule, and other animals are used for more practical purposes (some of them as beasts of burden), it need only be asked what animals draw the sleds of the Eskimos and others in the northern latitudes? Nor is this confined alone to the Arctic regions. Any traveler on the continent of Europe, and especially through Belgium, who has kept his eyes open, has seen these animals drawing heavy loads, and often taking the place of other draft animals. To indulge in technical refinement and declare that the dog is not subject to levy, although he belongs to a debtor, is useful to him, can be and is actually used, may be transferred by him to another, and is as much the subject of bargain and sale as any other property, merely because in the remote past the ownership of his progenitors may have been considered qualified or 'base,' seems to me untenable on its face. The ancient idea that 'animals which do not serve for food, and which therefore the law holds to have no intrinsic value,' were not the subject of larceny (4 Bl. Com. 236), has passed away. Now the stomach is not the only criterion of value. Even then, as already stated, a civil action could be brought for the loss of a dog. Generally property which may be sold and possession delivered is a subject of levy (omitting choses in action and equitable assets). 7 Am. & Eng. Enc. L. 127.

"The dog has been very often before the courts of the different States and of different countries, and has been the subject of a good deal of judicial humor and of judicial learning; but it bears a tinge of the ridiculous to contend that, however many and however valuable dogs a man may own, he can not be made to pay his debts if he will only invest his money in dogs, — a contention which reminds one of the very solemn discussions in a certain court, at a time not very long past as to whether the oyster was a wild animal. Before the courts, the dog has received a treatment as varied as that given him by authors. As illustrative of the widely different light in which judges have viewed him, I cite only one or two cases. Monroe, J., in 10 Rich. (S. C.) 52, indulged in some vituperative epithets upon a poor canine who was so unfortunate as to be run over by a railroad train. On the other hand, in the case of State *v.* Harriman, 75 Me. 562, in which a majority of the court held that dogs did not fall within the criminal statute of that State against the

killing or wounding of 'domestic animals,' Appleton, C. J., dissented most vigorously, making use of the following language (as quoted by the Supreme Court of Georgia in a case in 93 *Ga.*): 'He is a domestic animal. From the time of the pyramids to the present day; from the frozen pole to the torrid zone, wherever man has been, there has been his dog. Cuvier has asserted that the dog was, perhaps, necessary for the establishment of civilized society, and that a little reflection will convince us that barbarous nations owe much of their civilization above the brute to the possession of the dog. He is the friend and companion of his master — accompanying him in his walks, his servant aiding him in his hunting, the playmate of his children, an inmate of his house, protecting it against all assailants.'

"I need not stop to discuss the learned dog law evolved by judges of other States and countries. Turning to our own State, I will only glance hastily at the status of our law with reference to the dog. At the outset, I may remark that the argument used with reference to dogs applies much more strongly to some other animals and to birds. It will be readily perceived that lions, tigers, and other wild animals which are captured, and reduced from their native state to the subjection of the menagerie, are much less domestic animals, or animals in which there is absolute property, than dogs. So likewise birds which are entrapped and kept in cages are much nearer their wild state than the dog; and yet it will hardly be contended that all the traveling menageries of the country are free from levy, or that a man may set up an aviary and make an excellent living by selling birds, while his sorrowing creditors hang about his door with a bailiff and a fi. fa., but can come no nearer to the desideratum of a levy than to 'listen to the mocking bird.' If it be urged that there is no express enactment declaring the dog to be property and the subject of levy, I would suggest that I am unable to find express enactments making a great many other animals, which were originally wild, the subject of levy; nor am I aware of any statute abolishing the right of common pasture or of estovers or other similar rights, and yet our Supreme Court has not hesitated to hold that they are not applicable to present conditions.

"In the case of *Manning* v. *Mitcherson*, 69 *Ga.* 447, the Supreme Court of Georgia held that a canary bird which had been caught and tamed was property for which a possessory warrant would lie.

In the case of *Jemison* v. *Southwestern Railroad*, 75 *Ga.* 444, it was held that a dog was not such property that, if it were killed by a railroad train, a presumption would arise against the company, or that there could be a recovery for its mere negligent killing. The case in 10 Rich. 52, above referred to, is cited as authority, but an examination of the opinion in that case will show that the Justice rendering it used language referring not only to dogs, but to domestic fowls and animals other than cattle.   It is true that in the course of the opinion in the *Jemison* case the learned Justice who delivered it, made use of the following language:   'Dogs are not property in such sense as makes them assets belonging to the estate of a deceased person, and are never inventoried and appraised, however numerous or valuable, nor are they subject to levy and sale, so far as we are informed.'   But this was merely said arguendo.   No question of levy and sale was before the court; and while the Justice was one distinguished for his learning, such a casual remark can not be held to have been the deliberate decision of the court.   The constitution of the State (Civil Code, § 5883) authorizes the General Assembly to impose a tax upon such domestic animals as, from their nature and habits, are destructive of other property.   By the use of the expression 'other property' it is evident that these animals were treated as property by the fundamental law of the State.   Further, dogs are by the statute law of the State the subject of larceny.   (Penal Code § 164.)   The Civil Code, § 3822, provides for liability on the part of 'the owner' of a dog for damage done by it under certain circumstances.

  " In the case of *Patton* v. *State*, 93 *Ga.* 111, it was held that a penal statute then under consideration did not apply to the injuring or killing of animals of any kind; and therefore of course did not apply to the dog.   The opinion in that case is both interesting and instructive, but it did not undertake to decide that a dog was not property; and this is distinctly so declared in the case of *Graham* v. *Smith*, 100 *Ga.* 434.   On page 436, referring to the case of *Patton* v. *State*, it is said:   'In the latter case, however, the ruling was based on the construction that the subjects of that particular statute were inanimate property.'   In the case last cited it was held that 'The owner of a dog has such a property in it as will enable him to maintain an action of trover for its recovery in case of its wrongful conversion.'   In the well-considered

opinion it is expressly declared that a dog is property.   It seems to me that the principles there enunciated control this case.   Let it be remembered that in a trover case the plaintiff has the option of taking a verdict for the property, or a money verdict.   If he should take a money verdict, surely the law did not contemplate that he should sit in court with his judgment and fi. fa. in his pocket, and watch the defendant carry the dog away, because, although he could recover a judgment for its value, he could not realize it by levy.   In the case of *Wilcox* v. *State*, 101 *Ga.* 563, it was distinctly held that the words ' domestic animals  included dogs."

See also  in this connection Hamby *v.* Samson (Iowa), 40 L. R. A. 508, s. c. 67 Am. St. R. 285, et seq.;  Heywood *v.* State, 41 Ark. 479;  Mullaly *v.* People, 86 N. Y. 365;  Ingram on Law of Animals, 591;  Wilson *v.* Railroad, 10 Rich. (S. C.) 52 ;  Citizens Rapid Transit Co. *v.* Dew (Tenn.), 40 L. R. A. 518.

FISH, P. J.   I concur in the judgment and rulings of the court, for the reasons stated in the concurring opinion of Justice Cobb.