STATE OF NORTH CAROLINA v. JAMES E. WALLACE

No. 8015SC518

(Filed 18 November 1980)

**Hunting § 3– hunting deer with dogs – insufficiency of citation to charge crime**

A citation alleging that defendant "did unlawfully and wilfully operate a (motor) vehicle on a (street or highway) . . . By hunting deer with dogs in violation of Senate Bill #391" was insufficient to charge defendant with a violation of the criminal laws and was fatally defective.

Judge MARTIN (Robert M.) concurs in the result.

Judge HEDRICK concurring in result only.

APPEAL by defendant from *Clark, Judge.* Order entered 6 March 1980 in Superior Court, ALAMANCE County. Heard in the Court of Appeals 14 October 1980.

Defendant was accused of violating Senate Bill #391 which prohibits pursuing, hunting, taking or killing deer or foxes with dogs. At trial, defendant moved for a dismissal pursuant to N.C.G.S. 15A-954, alleging the law was unconstitutional on its face and that the court had no jurisdiction of the offense charged. The district court granted defendant's motion, and the state appealed.

In the case of *State v. Keck,* the same district court judge had previously held the pertinent statute unconstitutional.

On appeal in the superior court, the court heard testimony and entered an order holding the statute to be constitutional. The case was thereupon remanded to the district court for further proceedings as provided by N.C.G.S. 15A-1432(d). From this order, defendant appeals.

*Attorney General Edmisten, by Assistant Attorney General Donald W. Grimes, for the State.*

*Vernon, Vernon, Wooten, Brown & Andrews, by Wiley P. Wooten, for defendant appellant.*

MARTIN (Harry C.), Judge.

This is a case about dogs. As dogs do not often appear in the courts, it is perhaps not inappropriate to write a few words about them. The dog, a carnivorous mammal, has been kept in a

domesticated state by man since prehistoric time. "The memory of man runneth not to the contrary."

Diana, the Roman counterpart to Artemis, was the goddess of hunting. She was the twin sister of Apollo and was usually pictured with her hunting dogs, given to her by the wind-god, Pan. Cerberus, the three-headed dog, served as the watchdog at the gates of Hades. In the sky we find Sirius, the brilliant dog star, the brightest star in the entire heavens. Sirius floats through time at the hand of his master, Orion.

Edmund Burke in *The Sublime and Beautiful* (1756) said: "Dogs are indeed the most social, affectionate, and amiable animals of the whole brute creation." Herodotus reports in *An Account of Egypt* (5th Century) that dogs were regarded as sacred by the ancient Egyptians. When a dog died, the people of the house shaved their whole bodies and heads and the dog was buried in sacred tombs within the city. In Sir Francis Bacon's essay *Of Atheism* (1612), we find "for take an example of a dog, and mark what a generosity and courage he will put on when he finds himself maintained by a man."

Byron wrote:

> But the poor dog, in life the foremost friend,
> The first to welcome, the foremost to defend.

*The Talisman* tells that Richard I said:

> The Almighty, who gave the dog to be companion of our pleasures and our toils, hath invested him with a nature noble and incapable of deceit. He forgets neither friend nor foe — remembers both benefits and injury. He hath a share of man's intelligence, but no share of his falsehood. You may bribe a soldier to slay a man, or a witness to take life by false accusation, but you cannot make a hound tear his benefactor. He is ever a friend of man, save when man incurs his enmity.

The shape of history was changed by a spaniel who saved William of Orange from death by the Spaniards when they made a surprise attack upon his army at night. William and his sentinels were fast asleep but a small spaniel on the prince's bed barked furiously at the approaching footsteps. It sprang forward, scratched his master's face with a paw, and enabled him

to mount a horse and escape. To his dying day the prince kept a spaniel in his bedchamber.

Throughout history we find the fate of man and dog intertwined. Dogs have rescued kings and knaves, princes and paupers. Who will ever forget the heroic deeds of the great St. Bernards of the Alps? As one gazes through the window of time, the vision of a barefoot boy and his dog, walking down a dusty summer road, brings a tear to the eye. A boy without a dog! Life would be unbearable.

The dog is of a noble, free nature, yet is domesticated and dedicated to the well-being of people of all races. We find the dog's story told throughout our reports. One of the earliest cases, *Dodson v. Mock*, 20 N.C. 282 (1838), was an action for *trespass vi et armis* for killing plaintiff's dog by poison. Justice Gaston, for the Court, held that dogs belong to that class of domiciled animals which the law recognizes as objects of property. As such, the dog is entitled to protection of the law even though it may on occasion have stolen an egg, nipped at the heel of a man chasing it, or worried a sheep. Those offenses by a dog are not of a very heinous character. "If such deflections as these from strict propriety be sufficient to give a dog a bad name and kill him, the entire race of these faithful and useful animals might be rightfully extirpated." *Id.* at 285.

Justice Walker speaks of the dog in *State v. Smith*, 156 N.C. 628, 629-31, 72 S.E. 321, 321-22 (1911):

A dog is like a man in one respect, at least — that is, he will do wrong sometimes; but if the wrong is slight or trival, he does not thereby forfeit his life.

. . . .

. . . [W]e will say that the dog is not an animal of such base nature or low degree, whatever his pedigree may be, as not to be entitled to the consideration and full protection of the law, or as to subject him to outlawry if he has a bad reputation, or at least a habit of killing fowls, so that if he lurks near where they are to be found, although they are protected by a sufficient fence or other barrier against his predatory and ferocious disposition, he may be killed, even if he is not engaged in the actual attempt to slay and devour

his supposed prey, or the danger of his doing so is not so imminent or immediately threatening that a prudent and reasonable man would be led to believe that his property is in jeopardy. We cannot give our assent to this principle. Admit such a right, and the peace and good order of society would be seriously endangered and could not well be preserved, for the exercise of such a right would excite the most angry passions and resentment of the dog's owner and eventually result in personal violence, thus disrupting the peace and quiet of the community . . . . He [the dog] has the goodwill of mankind because of his friendship and loyalty, which are such marked traits of his character that they have been touchingly portrayed both in song and story.

In *Moore v. Electric Co.*, 136 N.C. 554, 557-58, 48 S.E. 822, 823, 67 L.R.A. 470, 471-72 (1904), we find:

It is not hazarding too much to say that it is a matter of common knowledge that in the classification of animal life (not including man) the dog occupies a position in point of intelligence, fidelity and affection superior probably to all of the others. He is known to have been for ages not only an animal of prey but wonderfully acquainted with the habits and ways of both man and beast and birds, keenly sensitive as to sight, hearing and smell, and remarkably agile in all of his movements. He can, by training and association with man, become adept in many useful employments and can be taught to do almost anything except to speak. They are known ordinarily to be able to take care of themselves amidst the dangers incident to their surroundings. Where a horse or a cow or a hog or any of the lower animals would be killed or injured by dangerous agencies the dog would extricate himself with safety.

. . . .

We think, therefore, that the dog, on account of his superior intelligence and possession of the other traits which we have mentioned in respect to the diligence and care which locomotive engineers owe to their owners and to them, must be placed on the same footing with that of a man walking upon or near a railroad track apparently in possession of all his faculties, . . . .

The Commonwealth of Kentucky recognized the virtues of the dog in *Shadoan v. Barnett,* 217 Ky. 205, 210-11, 289 S.W. 204, 206, 49 A.L.R. 843, 847 (1926):

[H]istory may be searched in vain to find a living creature exhibiting as much fidelity and affection as does the dog to and for his master. Neither cold, heat, danger, nor starvation deters him from manifesting those most excellent qualities in his love for his master, and those with whom he constantly associates. History is filled with instances where all others have fled, but the faithful dog stood guard, either as a mourner at his master's grave or with a determined purpose to administer to the latter if occasion presented itself. The press dispatches constantly record his unparalleled deeds of heroism for the protection and benefit of mankind, even at the sacrifice of his own life. Because of those qualities, his virtues have been touchingly described by poets and celebrated in song, and rightfully the dog as a companion is most affectionately regarded by all persons who truly estimate loyalty and friendship as factors in smoothing the path of this world's existence.

In 1897 the Supreme Court of the United States had this to say about dogs:

They are not considered as being upon the same plane with horses, cattle, sheep, and other domesticated animals, but rather in the category of cats, monkeys, parrots, singing birds, and similar animals kept for pleasure, curiosity, or caprice. They have no intrinsic value, by which we understand a value common to all dogs as such, and independent of the particular breed or individual. Unlike other domestic animals, they are useful neither as beasts of burden, for draft (except to a limited extent), nor for food. They are peculiar in the fact that they differ among themselves more widely than any other class of animals, and can hardly be said to have a characteristic common to the entire race. While the higher breeds rank among the noblest representatives of the animal kingdom, and are justly esteemed for their intelligence, sagacity, fidelity, watchfulness, affection, and above all, for their natural companionship with man, others are afflicted with such serious infirmities

of temper as to be little better than a public nuisance. All are more or less subject to attacks of hydrophobic madness.

*Sentell v. New Orleans & c. Railroad Co.*, 166 U.S. 698, 701, 41 L.Ed. 1169, 1170 (1897).

An opinion by then superior court judge Lumpkin (later supreme court justice) of Georgia states the history of the dog in inimitable fashion:

"The dog has figured very extensively in the past and present. In mythology, as Cerberus, he was intrusted with watching the gates of hell; and he seems to have performed his duties so well that there were but few escapes. In the history of the past he has been used extensively for hunting purposes, as the guardian of persons and property, and as a pet and companion. He is the much valued possession of hunters the world over, and in England especially is the pack o'hounds highly prized. In literature he has appeared more often than any other animal, except perhaps the horse. Sometimes he is greatly praised, and at others greatly abused. Sometimes he is made the type of what is mean, low, and contemptible; while at others he is described in terms of eulogy. Few men will forget the song of their childhood, which runs:

'Old dog Tray's ever faithful;
Grief cannot drive him away;
He is gentle, he is kind;
I'll never, never find
A better friend than old dog Tray.'

"Nor can any of us fail to remember the intelligent animal on whose behalf 'Old Mother Hubbard went to the cupboard.'

"Few men have deserved and few have won higher praise in an epitaph than the following, which was written by Lord Byron in regard to his dead Newfoundland: 'Near this spot are deposited the remains of one who possessed beauty without vanity, strength without insolence, courage without ferocity, and all the virtues of man without his vices. This praise, which would be unmeaning flattery if inscribed over human ashes, is but a just tribute to the

State v. Wallace

memory of Boatswain, a dog who was born at Newfound-
land, May 3, 1803, and died at Newstead Abbey, November
18, 1808.

"The dog has even invaded the domain of art. All who
have seen Sir Edwin Landseer's great pictures will know
how much human intelligence can be expressed in the face
of a dog. His picture entitled 'Laying Down the Law' will
not be forgotten in considering the dog as a litigant.

"Thus the dog has figured in mythology, history, poet-
ry, fiction, and art, from the earliest times down to the
present, and now in these closing days of the nineteenth
century we are called upon to decide whether a dog is a wild
animal (ferae naturae) in such sense as not to be leviable
property; or, if he is a domestic animal (domitae naturae),
whether he is not subject to levy on the ancient theory that
he had no intrinsic value if he was not good to eat.

"Originally all the animals which are now used by man
were wild. One after another they have become domesti-
cated, and subject to his control, ownership, and use. As
time progressed they gradually lost their character of wild-
ness, and became more and more subject to mankind, and
more and more regarded as ordinary property. At this day
no one would contend that the horse was not the subject of
absolute property because his ancestors were originally
wild; and the same may be said of other animals now thor-
oughly recognized as domestic. Even in the days of Black-
stone, while it was declared that the property in a dog was
'base property,' it was nevertheless asserted that such
property was sufficient to maintain a civil action for its
loss. (4 Bl. Com. 236.) Since that day, in the evolution of
civilization, the dog has not been left behind. He is now not
only prized for hunting purposes, as a watchdog, and as a
pet, but it is common knowledge that many dogs have an
actual commercial and market value. When annually there
is held in New York a bench show, at which dogs take prizes
amounting to thousands of dollars, and where they are
bought and sold at prices which are frequently far larger
than are paid for ordinary horses, it is rather late in the day
to assert that they are not valuable property.

"Dogs are also trained for purposes of exhibition, being sometimes the sole means of support of their masters. It would be an interesting survival of archaic law to say that a showman could put up his tent, give nightly exhibitions of his valuable dogs, making large sums of money from them, get in debt to any given extent, laugh at his creditors, and proceed with his daily exhibitions, on the ground that his stock in trade is not subject to levy. If it be contended that the horse, mule, and other animals are used for more practical purposes (some of them as beasts of burden), it need only be asked what animals draw the sleds of the Eskimos and others in the northern latitudes? Nor is this confined alone to the Arctic regions. Any traveler on the continent of Europe, and especially through Belgium, who has kept his eyes open, has seen these animals drawing heavy loads, and often taking the place of other draft animals. . . . The ancient idea that 'animals which do not serve for food, and which therefore the law holds to have no intrinsic value,' were not the subject of larceny (4 Bl. Com. 236), has passed away. Now the stomach is not the only criterion of value. . . .

"The dog has been very often before the courts of the different States and of different countries, and has been the subject of a good deal of judicial humor and of judicial learning; but it bears a tinge of the ridiculous to contend that, however many and however valuable dogs a man may own, he can not be made to pay his debts if he will only invest his money in dogs, — a contention which reminds one of the very solemn discussions in a certain court, at a time not very long past as to whether the oyster was a wild animal. Before the courts, the dog has received a treatment as varied as that given him by authors . . . .' . . . From the time of the pyramids to the present day; from the frozen pole to the torrid zone, wherever man has been, there has been his dog. Cuvier has asserted that the dog was, perhaps, necessary for the establishment of civilized society, and that a little reflection will convince us that barbarous nations owe much of their civilization above the brute to the possession of the dog. He is the friend and companion of his master — accompanying him in his walks, his servant

State v. Wallace

aiding him in his hunting, the playmate of his children, an inmate of his house, protecting it against all assailants.' "

*Strong v. Georgia Railway & Electric Co.*, 118 Ga. 515, 516-19, 45 S.E. 366, 367-68 (1903).

At common law it was not larceny to steal a live dog, but it was to steal a dead dog's hide. *Mullaly v. The People*, 86 N.Y. 365 (1881).

A French justice was once troubled by the following case, and his decision is unknown: A cattle drover and a butcher while dining together undertook to adjust their accounts. The drover's dog was lying by the table. The butcher took a note for 100 francs and handed it toward the drover, and it fell in the gravy dish. The butcher snatched the note from the dish, and while waving it to and fro to dry it, the drover's dog, evidently supposing that the note was a morsel of food, snapped it from the butcher's hand and swallowed it. The butcher demanded that the dog be killed and dissected. The drover refused, and the butcher then claimed that the dog had collected his master's account and that he owed the drover nothing. The drover insisted that the dog was not acting within the scope of his duties and authority, and sued the butcher to recover the account.

J. Seawell, *Law Tales for Laymen* 127 (1925).

No tribute to the noble dog is more eloquent than the following of Senator Vest in the Missouri case of *Burden v. Hornsby:*

"The best friend a man has in the world may turn against him and become his enemy. His son or daughter that he has reared with loving care may prove ungrateful. Those who are nearest and dearest to us, those whom we trust with our happiness and our good name, may become traitors to our faith. The money that a man has he may lose. It flies away from him perhaps when he needs it most. A man's reputation may be sacrificed in a moment of ill-considered action. The people who are prone to fall on their knees to do us honor when success is with us may be the first to throw the stone of malice when failure settles its cloud upon our heads. The one absolutely unselfish friend

that man can have in this selfish world, the one that never deserts him, the one that never proves ungrateful or treacherous, is his dog. A man's dog stands by him in prosperity and poverty, in health and in sickness. He will sleep on the cold ground, where the winter winds blow and the snow drives fiercely, if he may be only near his master's side. He will kiss the hand that has no food to offer; he will lick the wounds and sores that come in encountering the roughness of the world. He guards the sleep of his pauper master as if he were a prince.

"When all other friends desert, he remains. When riches take wings and reputation falls to pieces, he is as constant in his love as the sun in its journey through the heavens. If misfortune drives the master an outcast in the world, friendless and homeless, the faithful dog asks no higher privilege than that of accompanying him to guard against danger, to fight against his enemies. And when the last scene comes and death takes the master in its embrace, and his body is laid in the ground, no matter if all other friends pursue their way, there by the graveside will be found the noble dog, his head between his paws, his eyes sad, but open in alert watchfulness, faithful and true in death."

J. Seawell, *supra* at 127-28.

With this background on the legal perspective of dogs as it has evolved throughout our history, we now turn to the issue argued on appeal. Defendant insists the statute is unconstitutional on its face. He contends that, among other things, due process is denied when "any person, adult or child, who while in the company of a dog, which in response to its natural instincts, suddenly and without warning, catches the scent of a deer or a fox and gives chase" is subject to a violation of the criminal law and may be fined. While defendant's argument is intriguing and unique, on the record before us we are not required to reach any constitutional question. A constitutional question will not be passed upon if there is also present some other ground upon which the case may be decided. If the case can be decided on one of two grounds, one involving a constitutional question, the other a question of lesser importance, the latter alone will be determined. The Court will not decide questions of a constitutional nature unless absolutely necessary to a decision of the

case. *State v. Blackwell*, 246 N.C. 642, 99 S.E. 2d 867 (1957); *State v. Lueders*, 214 N.C. 558, 200 S.E. 22 (1938).

Here, we are faced at the threshold with the question of the validity of the process. Although counsel do not address this question, it arises on the face of the record.

The process in this case is a uniform traffic citation. Its pertinent parts are as follows:

State of North Carolina vs.

James E. Wallace

The undersigned officer has probable cause to believe that on or about 10:20 a.m., the 20th day of Nov. 1979 in the named county, the named defendant did unlawfully and wilfully operate a (motor) vehicle on a (street or highway) . . .

By hunting deer with dogs in violation of Senate Bill #391 which prohibits same . . . .

C.W. Swinney
Officer

It is obvious on the face of the citation that it fails to allege a violation of the criminal laws, and is fatally defective. It is the function of a warrant, or citation, to make clear and definite the offense charged so that the investigation may be limited to that offense in order that the proper procedure be followed and the applicable law invoked, and to put the defendant on notice as to what he is charged with and to enable him to make his defense. *State v. Hammonds*, 241 N.C. 226, 85 S.E. 2d 133 (1954). A warrant must express the charge against defendant in a plain, intelligible and explicit manner and contain sufficient matter to enable the court to proceed to judgment and thus bar another prosecution for the same offense. *Id.; State v. Brown*, 13 N.C. App. 280, 185 S.E. 2d 486 (1971). A cursory examination of the citation in question discloses that it fails to comply with this standard. Likewise, the citation fails to comply with the requirements of N.C.G.S. 15A-302. We hold the citation is fatally defective and the same should be quashed.

As the case is being disposed of on this ground, we do not reach or discuss the alleged constitutional infirmity. It is interesting to note, nevertheless, that the statute in question evidently had its origin in the ancient dog-draw of old forest law. Dog-draw was the manifest deprehension of an offender against venison in a forest, when he was found drawing after a deer by the scent of a hound led in his hand; or where a person had wounded a deer and was caught with a dog drawing after him to receive the same. Manwood, *Forest Law*, 2, c. 8. One way used to prevent dogs from running after deer was the "lawing of dogs," or cutting several claws of the forefeet of dogs. Black's Law Dictionary 1033 (4th ed. rev. 1968).

Finally:

It is a matter of common knowledge that there are many breeds of dogs endowed with special traits and gifts peculiar to their respective kind — the pointer and setter take instinctively to hunting birds; the hound to foxes, deer and rabbits, but we know of no breed which instinctively hunts mankind. Yet we know that dogs are capable of running the tracks of human beings, as is frequently evidenced by the lost dog trailing his master's track long distances and through crowded streets, and finally overtaking him, which demonstrates the further fact that some distinctive peculiarity exists between different persons which can be recognized and known by a dog. And it is a well known fact that the bloodhound can be trained to run the tracks of strangers; and in this the "training" consists only in being taught to *pursue* the *human* track; the gifts or powers or instincts being already inherent in the animal, he is induced to exercise them under the persuasive influence and protection of his trainer or master. Once trained in this pursuit, we must assume that his accuracy depends not upon his training, but upon the degree of capacity bestowed upon him by nature. Experience and common observation show that among dogs of the full blood and full brothers and sisters, one or more may be highly proficient, while others will be inefficient, unreliable and sometimes worthless; some may be acute to scent, while others will be dull to scent and incapable of running a "cold" track. Then again we may find the most reliable and favorite hound taking

State v. Wallace

the "fresher" track which crosses his trail, or quitting the "cold" trail of a fox and following the "hot" track of a deer which he may strike. Likewise, the pointer or setter may abandon a "cold" trail of a covey of birds and follow a "warmer" one upon which he may happen to run. Or the squirrel dog may leave the tree at which he has taken his stand and barked, and go to another, or quit entirely. So it does no violence to common experience to assume that dogs are liable to be deficient in their instincts. Therefore, we frequently hear huntsmen speak of some dogs as "true" and "staunch," while others will be denounced as unreliable or "liars." It sometimes happens that the best trained foxhounds will lead their master into a rabbit chase, or a pointer will hold his master with trembling excitement while he "points" a terrapin.

*State v. Moore*, 129 N.C. 494, 498-99, 39 S.E. 626, 627-28, 55 L.R.A. 96, 98 (1901).

The case is remanded to the Superior Court of Alamance County with direction that it be remanded to the district court of that county for the entry of an order dismissing the action.

Judge HEDRICK concurs in the result only.

Judge MARTIN (Robert M.) concurs in the result.

Judge HEDRICK concurring in result only:

I concur completely in the decision that the citation in question does not charge an offense. I am compelled to register, however, my opposition to using the North Carolina Court of Appeals Reports to publish my colleague's totally irrelevant, however learned, dissertation on dogs.