STATE, Respondent, *v.* STORM, Appellant.

No. 9033.

Submitted January 17, 1951. Decided on rehearing December 15, 1951.

238 Pac. (2d) 1161.

Mr. W. B. Leavitt, Miles City, for appellant.

Mr. W. E. Coyle, Butte, amicus curiae.

Mr. Arnold H. Olsen, Atty. Gen., Mr. William H. Coldiron, Asst. Atty. Gen., for respondent.

Mr. Leavitt and Mr. Coldiron argued orally.

On Petition for Rehearing

MR. CHIEF JUSTICE ADAIR:

From a judgment of conviction entered on a jury's verdict finding him guilty of murder in .the first degree, John Loy Storm has appealed.

At about 7:40 o'clock on the evening of Friday, April 1st, 1949, Russell Bean was shot in the back and killed. At the time he was seated at the supper table in his small four room country home located about 14 miles west of Forsyth. His back was to the south window. The bullet came from without. At about the center of the lower window pane the bullet made a small hole about the diameter of an ordinary wooden lead pencil.

With decedent at the time of his death were his wife and four minor children. It was after dark and the electric lights were on in the house. No witness was found who saw who fired the fatal shot.

· The Russell Bean home is located to the north of Finch siding on the main line of the Northern Pacific railway. Adjacent to Bean's south boundary line fence is an east west travelled country road known as the old Yellowstone Trail, referred to in the record as county road No. 1. Paralleling such county road

and adjoining it on the south is the railway's 'fenced right-of-way, wherein are located the main line tracks, a set of siding tracks and a set of spur tracks. Paralleling the railway tracks and to the south of the railway's south right of way fence is United States Highway No. 10. A side road leads north from U. S. Highway No. 10, crossing the railway tracks and extending north to the Bean dwelling which is located some 42 rods distant from U. S. Highway No. 10. A lane, referred to in the testimony as county road No. 2, extends south-westerly from U. S. Highway No. 10 to Mrs. Ethel Storm's dwelling and passes a trailer house located about 35 rods west of such dwelling, wherein at that time lived Ethel Storm's son, John Everett Storm, 31, and her divorced husband, John Loy Storm, 57, hereinafter referred to as Loy Storm.

Russell Bean's nearest neighbors were Mr. and Mrs. Robert Ross, whose home was located a quarter of a mile southeast of the Bean home. Mrs. Ethel Storm's dwelling was situate southwest of the Ross home and almost directly south of the Bean dwelling. The dwellings of the Rosses and of Mrs. Ethel Storm, as well as the trailer house occupied by Loy Storm and his son, were all located south of U. S. Highway No. 10.

Immediately following the shooting, Mrs. Russell Bean dispatched her young son on foot to the home of her nearest neighbors, Mr. and Mrs. Robert Ross, for help. The Rosses, accompanied by William Bean, then proceeded to the ranch home of Mrs. Ethel Storm, a sister of decedent where there was a telephone and from where phone calls were placed to Forsyth for a doctor and an ambulance. This done, the Rosses, accompanied by William Bean, Ethel Storm and Milton Chandler, proceeded to the Russell Bean home, arriving there about 8:30 o'clock p. m.

At about 8:50 o'clock p. m., W. C. Beals, the county coroner, accompanied by his brother Burdette Beals and driving an ambulance arrived from Forsyth.

At the trial the coroner testified that when he drove up, "there were quite a number of people in the house at the time;

there was Mr. Chandler, Milton Chandler, Mrs. Storm, Mr. and Mrs. Bob Ross and the Bean children, some of the Bean children.''

After the arrival of the coroner, Maurice Davidson, the undersheriff, accompanied by his wife drove into the yard of the Bean home where they were met by Milton Chandler who informed them of the homicide. The undersheriff entered the dwelling, made a hurried investigation and then sent his wife to Forsyth to summon the sheriff while Davidson remained at the scene.

Thereafter, various other persons, hearing of the shooting, came to the Bean home where they parked their cars and walked in and about the house and premises.

At about 10:00 o'clock p. m., the sheriff Floyd P. Dowlin, sometimes referred to in the testimony as ''Whitey'' Dowlin, arrived. Following a brief inspection of the body and the premises, the sheriff, accompanied by the coroner, proceeded to the trailer house occupied by Loy Storm and his son, arriving there about 10:40 o'clock p. m. Finding both occupants in bed, the sheriff informed them that someone had killed Russell Bean and, after talking with them and looking over the trailer house and its contents, the sheriff and the coroner returned to the Bean home.

Shortly thereafter Robert Ross, who drives the school bus, took Mrs. Bean and her children to the home of Mrs. Ethel Storm where the mother and children spent the night.

Thereafter the sheriff arranged for Eli Spannagel, a rancher and his hired man, Jack Clauson, to come to the Bean home and watch it for the remainder of the night when the officers should return to their respective homes in Forsyth.

Spannagel and Clauson arrived at the Bean home sometime after midnight and upon their arrival the coroner and the sheriff left for Forsyth with the body of the slain man.

At about 1:00 o'clock a. m., the undersheriff Maurice Davidson departed, leaving only Spannagel and Clauson at the Bean

home to see that nothing therein should be molested during the absence therefrom of the family and officers.

At about 6:00 o'clock on the morning of April 2nd, the sheriff returned to the Bean home and together with Spannagel and Clauson began examining the dwelling and premises for evidence. They observed the small hole in the lower pane of glass in the south window of the dwelling. The distance from the hole in the window pane to the floor of the house measured 36 inches.

*Track No. 1.* Shortly after his arrival, on Saturday morning, April 2nd, the sheriff called the attention of Spannagel and Clauson to a small oval depression in the yard where the grass appeared to be slightly pressed down, which depression was at a spot 49½ feet to the south of the damaged window. This depression proved to be so faint and indistinct that neither photograph nor cast could be taken of it, but the sheriff testified that in his opinion the track or pressing down of the grass represented a human footprint.

At the sheriff's direction, Spannagel marked the depression, hereinafter referred to as Track No. 1, with a small wooden stake which he twisted into the ground at the spot indicated by the letter "D" on a map of the area drawn to scale by the state's witness, H. G. Young, which map was introduced in evidence as the state's Exhibit 2.

After so marking the depression, the sheriff, Spannagel and Clauson walked back and forth over all that portion of Bean's lands located to the south of the dwelling searching for human tracks or footprints. The presence of numerous persons who had walked about the premises after the shooting, both before and after the arrival of the officers and the absence of any snow, rain or mud made this task most difficult.

When asked to state how the search was conducted, Eli Spannagel testified: "We followed—when we found a track we began to follow to see where this track went and there were some places that tracks weren't too plain and consequently we worked rather slow, sometimes going off in opposite directions

or some places to see if there were any other tracks or different kind of tracks that might have led away from this place and this one set of footprints we traced—this one particular footprint was the only track we could find that definitely led away from that place."

Mr. Spannagel also tsetified:

"Q. It wasn't raining the night you were on duty there? A. No, there was no rain.

"Q. Now how many tracks approximately did you observe or imprints, whatever we want to call them? A. Well I never attempted to count them, but a good many.

"Q. And who was with you when you made the observations? A. Whitey Dowlin, Jack Clauson.

"Q. Now we come back to the black dot marked 'D' to the south of the Bean house. Did you, Mr. Clauson and Mr. Dowlin or any other person after daylight, get up on that track, close to it? A. No.

"Q. What was the furthest that anyone was permitted to approach or did approach to the track 'D'? A. Well outside of marking it, I doubt whether there was anybody within foot and half or two feet.

"Q. All right now—and that's a fair approximation? A. Yes.

"Q. And that was made when a mark was made? A. Yes.

"Q. Now tell the jury what kind of a mark was made? A. Just a small stake was put up there.

"Q. By who? A. I put it up. * * *

"Q. Did you impress that stake into the ground at that point or was it necessary for you to drive it? A. I just put a little twist in it. * * *

"Q. Now did you after having marked that print to which you have just testified, Mr. Spannagel, and at the time that you marked that print, who stood back of you or around you there? A. Well at that time I believe that only Mr. Dowlin and Jack were there.

"Q. And that would be approximately what time in the

day? A . Well that would be while we were making this search for tracks, it was early in the morning."

*Track No. 2.* At a distance of 50 yards southwest of the dwelling the sheriff and his companions observed a second so-called track in the grass in Bean's field being what appeared to them to be a single footprint near Bean's west fence and referred to as Track No. 2.

*Track No. 3.* At a distance of about 80 yards from the dwelling the searchers observed a third so-called track in the grass in Bean's field located about eight feet inside of Bean's south boundary line fence and referred to as Track No. 3.

There was no evidence tending to show that Track No. 1 being the "depression" in the grass had any connection whatever with either Track No. 2 or Track No. 3 or that these tracks were either made by the same object or the same person.

About 9 :00 o'clock a. m. on Saturday, April 2nd, H. G. Young, an experienced civil engineer, at the sheriff's request, came to the Bean home where, accompanied by the sheriff, he viewed and examined the so-called footprints or tracks, made various measurements and surveys of the home and area thereabouts, performed certain experiments and made various maps of the dwelling and area.

When asked to describe the "depression", being Track No. 1, Mr. Young, a witness for the state, testified at the trial:

"A. Well the grass was pressed down and the soil was; the grass and soil was pressed down at that point. * * *

"Q. Describe the print specifically as to the size, character and appearance of it was. A. Well it was rather oval in shape and well, I would say about 8 inches by 5 inches, something like that.

"Q. And was there just the one? A. All I saw is the one. * * *

"Q. Did you make an examination of it? A. Yes; yes, I did.

"Q. Did it have the marks of a print, shoe print or footprint? A. It could have been.

"Q. What? A. It could have been.

"Q. What? Describe what it was; was it a depression or

hole in the ground? A. Well just a slight depression, the ground was rather solid there and comparatively dry and it was very evident there had recently been something in position there. Now when I saw it I couldn't positively say it was a footprint, knee print or whether something had been sitting down but there is some object in that position.''

On the morning of April 2nd, Mr. Young and Sheriff Dowlin performed an experiment or test by running a heavy fish line through the bullet hole in the window pane, anchoring one end of the line inside a heating stove in the Bean home and then carrying the line to the marked depression ''D'' measured by Sheriff Dowlin and Young at 49½ feet south of the south window. Young testified that he ''stretched it [the fish line] out onto the land and it came directly over the point 'D' '' and further that he was not sure whether the sheriff held the line inside the stove ''or whether we tied it but we anchored it there.''

Thereafter the sheriff removed the damaged south window from the Bean house and placed it in his car where the pane of glass, with the purported bullet hole in the center, fell out and was shattered. The window frame so taken from the house was admitted in evidence as the State's Exhibit No. 27 and the fragments of the shattered glass therefrom as the State's Exhibit No. 28.

To enable the engineer H. G. Young to accurately place on his maps the so-called ''footprints'' observed· by the sheriff, Spannagel and Clauson, the sheriff retraced his steps to each track, commencing with Track No. 1, being the ''depression''. At each so-called footprint the sheriff placed and held a surveyor's graduated twelve foot stadia rod while the engineer indicated the location of the track on his map. The sheriff would then move the stadia rod to the next track where the same operation was repeated until each track had been located on the maps.

*Other Tracks.* In addition to Tracks Nos. 1, 2 and 3 located in Bean's pasture, the sheriff claimed to have found in the

county road No. 1, to the south of Bean's land, two prints designated as Tracks Nos. 4 and 5. In a borrow pit inside the railway's right of way to the south of the county road the sheriff observed Tracks Nos. 6, 7 and 8. In the grass to the south of U. S. Highway No. 10, Track No. 9 was observed and in the field further south of the highway Tracks Nos. 10 to 19 were observed.

As to such tracks Engineer Young testified:

"A. I saw those on the morning of the 2nd; I saw those then.

"Q. And about what time in the morning of that day? A. Well as near as I can remember I got there about 9:00 o'clock and it was from that time on through the day, I wouldn't say just when it was I located—how I located them I followed the officers as they were locating those and they were really the ones that located them but I saw the tracks.

"Q. What officers were there? A. Mr. Dowlin and Mr. Handley and our local Highway Patrolman, Jack Marshall, and our Undersheriff and the Highway Patrolman from Miles City; those fellows were all there."

Also on the morning of April 2nd, Vern Handley, a police officer of many years' experience and an expert on footprints arrived at the Bean home where, accompanied by the sheriff, the undersheriff, the county attorney, the two highway patrolmen, H. G. Young, Eli Spannagel and Jack Clauson, he inspected and examined each track.

As to the "depression" being Track No. 1 located 49½ feet south of the dwelling, Vern Handley, a witness for the state testified:

"Q. Did you examine that one? A. Yes, sir; I did. * * *

"Q. Did you attempt to make any impression of it? A. No. * * *

"Q. Did you observe at that time a stake marker there? A. There was a small twig set up very closely to this impression. * * *

"Q. Can you state from your examination, basing your

answer upon your observation and experience, the observation, what kind of a print that was? A. My observation?

"Q. I am talking about 'D' now, the first print. A. That was rather depressed in the center or bowl shaped slightly and my conclusion was that it appeared to be a knee impression more so than any other type.

"Q. An impression of a knee? A. Yes.

"Q. Than any other type? A. Yes.

"Q. That conclusion, as I understand, is based specifically upon the observation that you made in connection with the impression? A. That is right.

"Q. Were the impressions—what particular observation did you make in connection with the imprint that would differentiate it to you from a footprint? A. It had no sharp corners whatsoever and it was different shape than a sole of a shoe would normally make.

"Q. Have you studied and observed knee prints? A. I have made several tests, yes.

"Q. Was it similar to knee prints you have seen established by proof? A. That is right.

"Q. And that's the reason you call it a knee print? A. From my observation, yes.

"Q. From the other prints that you saw, did you form a conclusion as to whether they were knee or footprints? A. The balance of the prints or fragmentary prints, depressions that were made by a man, I would say.

"Q. From your impression, are you able to say whether they were shoe or overshoe prints? A. I'd say heavy rubbers or overshoes were worn."

On his direct examination by the special prosecutor Sheriff Dowlin testified:

"Q. Now Mr. Dowlin, you have clearly in mind that the point 'D' on the State's Exhibit No. 1 is identical for illustrative purposes with dot No. 1 on State's Exhibit No. 2. is that right? A. Yes, sir.

"Q. Did you personally, in addition to your working as an

assistant to the Engineer Young to the locating and fixing of the footprints referred to, locate those footprints by personal examination entirely aside from the examination which you made with the rod? Strike the question, it's confusing, it even confuses me. Mr. Dowlin, did you personally fix both as an individual without being an engineer's assistant as testified to by Mr. Young, the location and identity of each one of those footprints which is marked on that plat? A. I did.

"Q. Now reverting to the area surrounding the footprint No. 1 and the residence and the area represented around particularly footprint No. 1 or point 'D'—A. Yes, sir.

"Q.—did you instruct specifically Mr. Spannagel and his assistant to carefully guard that situation? A. Well we did not discover that footprint until the morning."

Not having come to the Bean home until after midnight on Saturday morning, April 2nd, Spannagel and Clauson knew nothing about the situation which there obtained prior to their arrival.

The state's expert witness on footprints and the sheriff reached somewhat different conclusions respecting Track No. 1.

On his direct examination Sheriff Dowlin testified:

"Q. Mr. Dowlin, there seems to be in my mind some confusion to which my attention has been directed as to what has been referred to in our Exhibit No. 1 as a footprint; of course if it had the appearance of a footprint to you I want to know it; what kind of a print, if you have concluded from your personal examination, was it? A. Well, it was—

"Mr. Leavitt: I would ask that the Court not permit the witness to give his opinion but to state what it was.

"Q. State what it was?

"The Court: In other words, describe it.

"Q. Yes. A. Well it was a very definite footprint.

"Q. Describe the condition around it, describe the ground. A. Well the ground was in that—to make myself clear I'd have to do some other explaining, if possible.

"Q. You can if it's not objectionable and if it is Mr. Leavitt

will stop you; just go ahead and state the facts. When the witness H. G. Young was on the witness stand according to my recollection, he described that as an impression in the ground, 5 inches by 8 inches and I want to go into it now. Later when I was examining the witness I referred to it as a footprint, I am not sure whether somebody said it was a knee print, I don't remember the record exactly, but in any event what I want you to do is to tell the ladies and gentlemen of the jury, to describe now I am talking about No. 1, that's the one which is in this case as is located from the engineer's testimony 49½ feet south of that window. A. Yes, sir.

"Q. That is the window which is shown on State's Exhibit 1 is the one which a bullet went through. A. Yes, sir. * * *

"My reasons for getting out there so early on the morning of the 2d—

"Q. (Interposing) I don't want to go into that; what you have explained is all right but what I want you to do now is to describe—you told us there were fresh conditions there, now tell us about that No. 1, that is the point we are interested in. A. Well there was a footprint.

"Q. That's your opinion? A. My opinion, yes.

"Q. Describe it? A. Well there was just a footprint there.

"Q. All right, that's fine. Now was it similar to other prints that you followed? A. It wasn't as plain as some of the others but it was similar of the others."

In covering the lands to the south of the house the state's witness Vern Handley found but one footprint on all the Bean premises that was sufficiently distinct to furnish an impression or cast, being Track No. 3 located 80 yards southwest of the dwelling but about eight feet from the boundary line fence separating the Bean lands from the county road No. 1.

*Plaster Cast—Exhibit 11.* By filling Track No. 3 with a quick drying dental plaster Vern Handley made a plaster cast thereof which cast was admitted in evidence at the trial as the State's Exhibit No. 11.

*Plaster Cast—Exhibit 12.* Mr. Handley next filled with

plaster Track No. 4 located in the county road and the resulting plaster cast was admitted in evidence at the trial as the State's Exhibit No. 12.

*Plaster Cast—Exhibit 10.* A heel print in the soft borrow pit within the railway's right of way and to the south of the county road was also filled with plaster and the resulting cast was admitted in evidence as the State's Exhibit No. 10. Mr. Handley testified that he could not accurately state whether this exhibit was made from Tracks Nos. 6, 7 or 8 but that in his opinion it represents one of the three tracks so numbered.

Mr. Handley completed his examination of the various tracks and the making of his plaster casts at about 12:30 p. m. on Saturday, April 2nd. Only three of the tracks would admit of either photograph or cast. All the others proved to be entirely too faint and indistinct.

The three plaster casts being the State's Exhibits Nos. 10, 11 and 12 are now before this court, having been certified to this court as original exhibits.

State's Exhibit No. 10 obviously is a cast of an impression made by a much smaller and narrower heel and different shoe than made either Track No. 3 or 4 from which the other two plaster casts were taken.

State's Exhibit No. 11 clearly is a cast of an impression made in the grass by a right overshoe having a much wider and different shaped heel than the shoe that made the track from which the State's Exhibit 10 was taken.

State's Exhibit No. 12 is a cast of an impression made in the travelled county road by a right shoe with a heel, sole and toe much smoother and more indistinct than those shown on the State's Exhibit No. 11. It would appear that the State's Exhibits Nos. 10, 11 and 12 were taken from tracks left by different shoes of different sizes and shapes and from footwear with which the accused was never connected or identified.

When the sheriff examined defendant's shoes on his visit to the trailer house on the night of April 1st he found them dry with no signs of any recent accumulation of mud thereon.

According to Handley, the footprint expert, the tracks pointed out by the sheriff were made by heavy rubbers or overshoes, yet no such footwear was found or shown to have been possessed or worn by defendant at the time involved. Defendant testified that he had no rubbers or overshoes at the time and this testimony stands wholly uncontradicted. The shoes worn by defendant are now before this court certified here as original exhibits and their comparison with the casts shows beyond question that such shoes never made the impressions or imprints from which the casts were taken.

At the close of the state's case, defendant's counsel made a motion to strike the evidence relating to the tracks as testified to by the state's witnesses Young, Dowlin, Handley, Spannagel, Clauson and Davidson, and again at the close of the entire case a like motion to strike such evidence was interposed by defendant's counsel, and defendant here assigns as error the denial of the motions.

There being no evidence that connects or identifies the defendant with any of the footprints, the motions should have been granted. As is said in Kinnan v. State, 86 Neb. 234, 125 N. W. 594, 595, 27 L. R. A., N. S., 478, 480: "We think this evidence should have been excluded. No testimony was produced showing or tending to show that the footprints were made by the defendant. It is not shown that they corresponded in any way with the shoes worn by him, and the only fact shown which tended to connect him with them in any manner was that they led in the direction of his home. We think this evidence was erroneous and prejudicial to the defendant's rights, and is within the rule announced in Heidelbaugh v. State, 79 Neb. 499, 113 N. W. 145." Also see State v. Burch, 195 Iowa 427, 192 N. W. 287, 31 A. L. R. 198.

Defendant assigns as error the admission in evidence, over his objections of the State's Exhibits Nos. 10, 11 and 12, and also the denial of his timely motions to strike the evidence relating to the casts made at the close of the state's case and again at the close of the entire case. The objections should

have been sustained and the motions granted, for here again there was no evidence that connects or even tends to connect or identify defendant with any of the plaster casts so received in evidence. To render it admissible and proper the evidence must at least tend to connect the defendant with the tracks or footprints from which the casts were made. In short the proof must show "that he left such evidence behind him." A defendant on trial for murder may not be convicted on conjectures, however shrewd, on suspicions, however justified, on probabilities, however strong, but only upon evidence which establishes guilt beyond a reasonable doubt.

*The New Overshoes—Exhibits Nos. 33 and 34.* Unable to find any shoes, overshoes or other footwear belonging to defendant that corresponds with any of the tracks or the plaster casts about which they had introduced testimony and exhibits, the prosecutors for the state introduced in court a pair of new heavy overshoes apparently purchased at one of the local stores in Forsyth for the express purpose of placing them on defendant's feet at the trial should he take the witness stand. These brand new overshoes that had never been worn by anyone were marked as the State's Exhibits Nos. 33 and 34 and, over defendant's objections, admitted in evidence and defendant has assigned as error the admission of such evidence.

After the state had rested its case in chief, defendant took the witness stand and testified in his own behalf. He was then cross-examined by the special prosecutor who, in the presence of the jury, compelled defendant to place on his feet the new overshoes so purchased by the state for the occasion and to there submit to tests of comparison with two of the plaster casts being the State's Exhibits Nos. 11 and 12.

The State's Exhibits Nos. 10, 11 and 12 each is a plaster cast made from an impression or print of a right foot of some person or persons, unknown. None is of a left foot.

The State's Exhibit No. 33 is a brand new overshoe for a right foot while the State's Exhibit No. 34 is its mate for a left foot. We have carefully compared these overshoes with the

casts. Each overshoe is considerably longer than the impressions or prints from which the plaster casts were taken and it is plain that the prints from which the casts were taken were never made by overshoes as long and as large as the State's Exhibits 33 and 34.

Undaunted by these obvious facts and conditions the prosecution in the presence of the jury handed to defendant the brand new overshoe for the left foot (Exhibit No. 34) and directed him to place it on the plaster cast with the suggestion: "Q. Seems to fit doesn't it?" The Exhibit No. 34 neither "seems to fit" nor does it fit the cast. It was and is obviously too large for the cast. An overshoe made for a left foot may sometimes be placed on a right foot but it seldom "seems to fit" a right foot as well as the foot for which it was made. The comparison was unwarranted and the proceedings thus indulged before the jury were highly prejudicial.

As was said in People v. Mullings, 83 Cal. 138, 145, 23 Pac. 229, 231, 17 Am. St. Rep. 223: "It is quite evident that the questions and not the answers were what the prosecution thought important. The purpose of the questions clearly was to keep persistently before the jury the assumption of damaging facts which could not be proven, and thus impress upon their minds the probability of the existence of the assumed facts upon which the questions were based. To say that such a course would not be prejudicial to defendant is to ignore human experience and the dictates of common sense." Compare: Stokes v. State, 5 Bax., 64 Tenn. 619, 30 Am. Rep. 72; Day v. State, 63 Ga. 667; Kinnan v. State, supra; Hodge v. State, 97 Ala. 37, 12 So. 164, 38 Am. St. Rep. 145; Johnson v. Craig, 172 Iowa 401, 154 N. W. 584; Parker v. State, 46 Tex. Cr. R. 461, 80 S. W. 1008, 108 Am. St. Rep. 1021, 3 Ann. Cas. 893; Ballenger v. State, 63 Tex. Cr. R. 657, 141 S. W. 91.

*Trailing by Bloodhounds.* On the morning of April 2nd the sheriff arranged with one George Talbot, 36, of Corvallis, Montana, to bring to Forsyth two young bloodhounds owned and trained by him.

At about 2:30 o'clock on the afternoon of April 2nd, Talbot arrived by plane with the dogs and after giving them a brief rest he was driven by Sheriff Dowlin to the Bean home, arriving there at about 3:00 o'clock p. m.

Sheriff Dowlin immediately showed Talbot the so-called depression being Track No. 1, still marked with the small wooden stake which Eli Spannagel had twisted in the ground some nine hours before. The sheriff indicated to Talbot that such stake marked spot was to be the "starting point" from whence his dogs were expected to obtain a scent and then start trailing someone somewhere, and it was from there the trailing began.

After thus starting the dogs the sheriff manifested but little interest in their chase. He did not follow the hounds. Instead he walked from the Bean house in a southeasterly direction to the lane leading southwesterly from U. S. Highway No. 10 toward the Storm trailer house, where, at a point on such lane near a gate, he climbed into a state highway patrol car operated by patrolman Jack Marshall and was then driven down the lane to a point about ten or fifteen feet south of the Storm trailer house where the sheriff got out of the car and walked to the south door of the trailer house wherein he found and talked with the defendant and his son.

Other cars, occupied by other peace officers followed the sheriff and patrolman Marshall down the lane and stopped near the trailer house where the officers stepped out and took separate stations to the south and to the west of the trailer house where they awaited the anticipated arrival of Talbot and his hounds. Among the officers there awaiting the arrival of the dogs, in addition to Sheriff Dowlin, were: State Highway Patrolmen Jack Marshall and Louis Alecksich, Undersheriff Maurice Davidson, Deputy Sheriff Charlie Lyons and Vern Handley, Chief of Police of Miles City.

After a time, the captive dogs approached from the north, sniffed at the trailer house and then lay down. The sheriff then brought the defendant out of the trailer house and guided him to the place in the road where the dogs were then lying. Upon

defendant's approach the two friendly but hungry beasts got up,—wagged their tails,—sniffed defendant's unlaced shoes and licked his empty hands, begging for food, whereupon Talbot, pointing an accusing finger at the defendant, said ''That's your man.''

Thus at a pre-trial conference conducted in a country lane by a dog trainer, his two nineteen months old dogs and six assembled peace officers, was the defendant pointed out as the one who had made the depression being Track No. 1 and therefore the one who fired the fatal shot.

At defendant's trial held some eight months later, the state, over defendant's repeated objections, was allowed to call to the witness stand George Talbot and the various members of his audience of peace officers who had participated in the demonstration so conducted and to relate to the jury the so-called ''bloodhound testimony'' as it had been interpreted and translated for them by Talbot, the dogs' handler.

As a foundation for this testimony George Talbot testified to the history, pedigree, qualifications, training and experience of the dogs. He testified that the dogs were bloodhounds of pure blood; that they were litter mates, whelped August 29, 1947; that he got them from one Lewis Layton of Chicago when they were seven weeks old; that he had never theretofore owned or handled any bloodhounds but that he had previously owned some coyote dogs; that both dogs were males; that one had been totally blind since he was five months old and that such blindness did not affect the dog's trailing ability but only made him keener of scent.

Talbot also testified that when the pups were about two months old he commenced their training; that he had never taken lessons from any expert breeder or trainer of bloodhounds; that he had had no previous experience in training such dogs; that when he bought the pups the seller gave him a letter of instructions on how to train bloodhounds; that he followed such letter of instructions and supplemented the same

by some literature on training bloodhounds which he had picked up and read.

· When asked to ·inform the court as to how he had trained these dogs, Talbot testified:

"A. Well to get a bloodhound to start to run a track you have to hold him and let some other person torment him with meat and otherwise just feed him a little bit.

"Q. When you start to train him? A. Until he gets eager to run and then they move away from them in which they ride or drop a garment that has a personal scent on it, on their personal clothes, and they go a short distance out of sight. Then when you start your dog you lead him to this garment in which he dropped his head on or track and from there he has to trail the man in which he wants to get the meat from.

"Q. Yes. A. And then as you go along in your training you have other people enter into the training such as—I used my wife.

"Q. What do they do? A. They cross-track in which the dog is running.

"Q. Well go ahead and tell a little more detail about that. A. Well if they—like if I have four people out there and I am running one in which one drops the garment that I start my dog on then in the training the others pack a willow to persuade the dog that he has to stay with the track. If he takes over to one of those others he goes to the party which, if it's wrong, they give him a slap with this willow and I take him back and start him over and that's the way he is taught; he has to run that one certain track or there is no reward."

The witness testified that his training season for the dogs was "from April until September, about the 15th of September and then from then I just rode them behind the car to keep them hard. If you use a bloodhound on one track it's hours before you can start him over on a. different scent without teaching them to track. * * *

"Q. Now when the dog is started upon a track, say it's a track in the ground some place, tell us how you put the dog on

that track? A. If there was a track in which you wanted to start your dog and had no garment to start him on, you'd carry your dog from the car with his head high and then the minute that you drop his head on the scent, that's the scent in which he takes in and follows.

"Q. And is that the training that these dogs have been subjected to, have they been subjected to that particular kind of training and also the garment training? A. That is right.

"Q. So that a great many times these dogs have been started by holding their head up and lifting them above the ground in arms and carrying them to a track. A. No.

"Q. How do you do it? A. You run your dogs with a collar and harness and when you take your dog from the car you hold his head up so he can't get it to the ground. * * *

"Q. Now what is the conduct of the dog, of these dogs in question when they terminate or find the person; what do they do? A. They jump up on them and lick them and wag their tails in which way they are begging for their reward of their feed.

"Q. They are not vicious, in other words? A. Absolutely not.

"Q. Not trained that way. A. No, sir. * * *

"A. To start your dog on a track of this kind?

"Q. After they have been on it [a track] yes; after they have been on the track and they come across track duplications of other tracks? A. That don't interfere.

"Q. Don't bother them in any way? A. No.

"Q. Can you tell the court how they act, what do they do? A. They just go right on through, they can distinguish the scent they are on from the scent of other people; all they know is just the one scent that they started on. They will identify their man in a group, not only when I am running but where another man is running my dogs and if they are placed upon a wrong track, that dog won't know what you want outside you want him to run the scent, he will go on. If I put him on the wrong track, which is my fault, not the dog's fault, he will go on with that scent regardless of whether the man is lost or

looking for the man that is lost, but that's my fault if I start him on the wrong track.''

On cross-examination Talbot testified:

''Q. How do you commence your training? A. By letting someone stand in front of your dog and tormenting him with a little meat and then move away and hide and he drops a garment, when he runs so far he drops a garment. * * *

''Q. And in following this person you'd follow him to the location where the defendant was either hiding or was located? A. The dogs would, yes.

''Q. You would seek out the person then, would you, from his location where ever he might be? A. That is right.

''Q. Following up to where he had stopped or where he was staying? A. That is right.

''Q. They would usually follow the man right up to where he was? A. They did, yes.

''Q. And what demonstration would they make? A. Well to start with you give them meat, you don't give it to them all at a time and as they go on in training you give them a little and they will stand around the person and keep begging to be fed. * * *

''Q. Will a dog follow a trail that has had the scent of the supposed man given to him better than they will without the scent given to him in the beginning? A. No, the scent in which he first gets into his nose, that's the one he runs. If you would put him on the wrong one—for instance, if there was somebody you wanted here that went through that window and you got up there and messed around that track and I would accidentally, not knowing the case, would drop the dog on your scent, or on a handkerchief you had handled, the dog would run you rather than the man that made the track because I gave him the wrong scent to go by.

''Q. In other words, you'd have to get the correct trail in the beginning? A. The dog will trail whose ever scent he takes.

''Q. Yes.''

When the preliminary foundation testimony had been com-

pleted Mr. Leavitt, counsel for defendant and Mr. Haynes the special prosecutor, stated their respective views on the admissibility of such evidence as follows:

"Mr. Leavitt: Of course, we are going to contend under the decisions that have held that this form of testimony is not competent. Mr. Haynes on the other hand is going to rely upon those authorities that hold that it is. We submit as far as we are concerned and claim that the evidence is absolutely incompetent; it is permitting the jury to consider facts which in our opinion have no competency at all and we will include in our objection to that testimony, if the court admits it.

"Mr. Haynes: The court doesn't need any statement from anybody, the court is perfectly familiar with the fact that in the event the testimony goes to the jury that it goes under special limitation as being merely circumstantial. They cannot convict upon bloodhound testimony in any court.

"Mr. Leavitt: The question now before the court is whether or not the court will or will not admit this evidence as competent evidence.

"The Court: Of the action of these two dogs.

"Mr. Leavitt: These bloodhounds.

"The Court: The qualifications of these bloodhounds is only supported by the testimony of the owner, Mr. Talbot.

"Mr. Haynes: That is the best evidence in the world, you might have a dozen certificates.

"The Court: But the Certificates of Registration of the American Kennel Club is recognized in courts of law as a certificate of that dog being a pure bloodhound.

"Mr. Haynes: And it isn't ten percent that the weight or value that the testimony of that dog is.

"The Court: So far as this court is concerned, it is quite influential.

"Mr. Haynes: If it's true to the jury it is true to the court.

"Mr. Leavitt: I don't agree with that.

"The Court: I can't either.

"Mr. Haynes: I can show you the cases."

*Bloodhound Testimony.* After considering the foundation testimony the court, over defendant's objections, admitted the so-called "bloodhound testimony" as same was related and testified to by the state's witnesses Talbot, Dowlin, Davidson, Marshall and Alecksich.

The evidence shows that throughout the entire trailing each dog wore a collar and -a control harness. A short chain was snapped in each collar which kept the dogs from separating more than one and one-half feet. A lead chain attached to the tie chain was held by Talbot. Thereby were the captive dogs in his control. Where the dogs went there he went. At all times he held the lead chain and harness, staying at a distance of about three feet to the rear of their rumps.

Sheriff Dowlin testified: "After we arrived at Finch I took Mr. Talbot over and showed him an imprint. Then Mr. Talbot went back to the car that the hounds was in and led them over. He appeared at the time to have ahold of their collars holding their heads up, and led them over to this print. Then he let go of their heads or put their heads down to the print and the hounds did quite a bit of smelling, sniffing. Then the hounds took direction south and a little bit west from the Bean home out through the fence to what's known as the old county road."

Talbot testified: "He [Sheriff Dowlin] took me over and I looked and seen that the mark and track was there in which there was a place to start the dogs from so then I went back to . the car and got the two dogs and brought them out with their heads high and dropped them on the track going towards the house or window."

Talbot testified that when he took his dogs from the car at the Bean house, he "snapped them together." He further testified on his direct examination:

*Dogs Dragged off Scent. "A.* I dropped their heads on this scent or *just a little ahead of where the mark was* so that there wouldn't be no confusion if somebody had walked in back to take a look, *I dropped them a little bit farther towards the window on the track and from that they was headed towards*

*the house* and then they swung right around and come back and come through the fence or across a little field there as I remember it and to the fence, up on to the railroad right-of-way, along side of the tracks and they made a little run up the track in which they turned right around and come back down to where they left on the track, they went across the railroad track on to the highway and went on across to the other side of the highway to the—there was some cat tails or something there and a fence but we had to crawl it but *I drug them off from there and took them down to the approach where this road that goes into the field in which I think you said was the county road, comes up on to the highway. * * ** 

"Q. Now you have told us about getting down to what you described as a little cat tail bog. A. Yes.

"Q. That was directly in front of you? A. Yes.

"Q. What was it you did there? A. *Well the dogs, they wanted to go on to the cat tails;* where there is cat tails there is subsequent water and I didn't want to walk in there with this county road and all I had to do was just to go down the road probably one hundred feet or so and get on to the county road and come back up into the field in order to put them back where they wanted to go.

"Q. And you did do that? A. *I drug them off to the scent there,* I won't say it was a track.

"Q. You weren't paying any attention to tracks? A. No.

"Q. Now the dogs were leading you up to that point. A. Sure.

"Q. *Now when you took them as you say or jerked them up* and instead of you being in their control *then they were in your control,* is that what you mean? A. That is right, *I drug them away from there.*

"Q. What did you do from then on? A. Well *I took them down the highway to this county road* and walked the county road and back around the end of the fence to get around this slough or cat tails, whatever was in there, and just went along the fence until they hit the scent again in which they wanted to run."

When Talbot dragged his hounds off the scent they had been following, they then took an easterly course along U. S. Highway No. 10 and went to the spot where Sheriff Dowlin had climbed into the patrol car.

Talbot testified that in trailing, his dogs "run the hot-test scent" and that "when a man will get in a car, they trail to the road and that's the end of it."

Patrolman Jack Marshall testified: "After crossing Highway No. 10 they [the dogs] went down along the shoulder of the road, worked back and forth a little bit and then went east to where there was a gate.

"Q. East on Highway 10 to a gate? A. Yes.

"Q. And that would be at what point upon State's Exhibit 2? A. That would be the gate to the entrance of the road that runs north and south.

"Q. Then that would be—A. The road that—

"Q. The junction of County Road 2 with U. S. 10? A. Yes, the road that runs into the Ethel Storm home. After going through the gate they went west again back along the fence."

Talbot testified that his dogs trail neither by track nor sight but wholly by scent; that track means nothing to a bloodhound, either coming or going; that the dog "won't run the actual track, he don't care about the track, it's the scent which he gets into his head from the garment or the starting track"; that when he dragged the dogs from the scent they were pursuing at the cat tail bog he then proceeded east along the highway approximately 100 feet; that "there is a lane there that comes on to the highway from this field or trailer house and I just took them to the approach of that and when I got back they started hunting for the track and then they hit it and started right out again."

The "lane" that crosses "onto the highway from this field" is the county road No. 2 where Sheriff Dowlin ceased walking and climbed into the patrol car which carried him to the trailer house.

After leaving the place where Sheriff Dowlin entered the

patrol car the dogs and Talbot turned about and entered a field to the north of the Storm trailer house.

Talbot further testified: "Q. Now proceed and describe in detail the conduct of the dogs? A. Well they just led me right on over to the trailer house and when they got within some feet, thirty or forty feet, something like that, of the trailer house as I recall, they quit trailing or quit picking the scent from the ground and threw their heads in the air and started scenting the person in which they wanted from out there at that distance."

Talbot further testified that when he arrived at the trailer house he presumed the sheriff "was inside because I could hear them talking, the sheriff talk and I just waited there by the corner of the trailer house which the dogs wanted in, they reared up on the side of the trailer house then at the door to get in.

"Q. What was that? A. And from there I waited; pretty soon the sheriff brought the man, Mr. Storm out and the dogs both run up to him and reared up on him and licked his hands and expected to get something to eat.

"Q. Did they wag their tails and express delight? A. That was who they were looking for.

"Q. That was the person they were looking for? A. That is right.

"Q. Now you have seen that happen under similar conditions and circumstances, observed the same conduct; as I understand you have had these dogs at the termination of scenting and the finding of the person many, many times, is that correct. A. That is right."

Both the defendant Loy Storm and his son were in the trailer house when the sheriff entered. However the dogs were not allowed to enter the trailer nor was the son brought out to confront the dogs nor was he permitted to meet them. It was the sheriff not the dogs who found defendant and his son. In fact the sheriff and the coroner had found and talked with both the

defendant and his son more than sixteen hours before the dogs arrived.

On cross-examination Talbot testified:

"Q. You say that they brought Mr. Storm out of the trailer house when you got down there with your dogs, did they? A. They brought him out after we was there.

"Q. Before any recognition had been made. A. Yes, sir.

"Q. And he, who brought him out, do you know? A. Whitey.

\* \* \*

"Q. Why didn't you follow Mr. Storm into the house rather than to having to bring him out to meet the dogs? A. I just told you the door was locked.

"Q. Well there was a door on the other side? A. He was already—the Sheriff was in the house.

"Q. That's what I understand, yes; but why wasn't the dogs permitted to follow Mr. Storm directly into the trailer house instead of bringing him on the outside to meet them? A. I just guess we never thought, I guess we never thought of that.

"Q. You wasn't letting a man chase the dogs, were you: instead of the dogs chasing the man? A. I wouldn't have cared.

"Q. What? A. I wouldn't have cared.

"Q. At any rate that was what was done, was it? A. Yes, sir, he was brought out."

At the trial Sheriff Dowlin testified:

"A. After the bloodhounds arrived at the trailer house I said to the defendant, I says, 'Come on, Loy, let's get it over with.'

"Q. What else did you say? A. I says, 'Either you did or you didn't do it,' and he put his shoes on and came out of the door. We walked around the south end of the trailer house and stopped and oh, I'd say maybe 20 feet or 15 feet from the hounds and they got up.

"Q. All right now describe exactly what, according to your best recollection, the hounds did? A. They come running up to the defendant and smelt of his shoes and trousers and licked his hands and wagged their tails."

Undersheriff Davidson testified:

"Q. Now did Mr. Storm come out of a trailer about that time, out of the trailer? A. Mr. Dowlin, I believe, brought him out.

"Q. Mr. Dowlin went into the trailer and got him, is that it? A. Or asked him to come out.

"Q. Did anyone else come out of the trailer with the defendant, John Loy Storm? A. No.

"Q. Was there anyone else in the trailer at that time? A. His son, Johnny.

"Q. John Everett Storm, is that right? A. Yes.

"Q. Now will you describe to the Court and the jury the reaction of the dogs upon seeing the defendant, John Loy Storm? A. They brought—

."Mr. Leavitt: I understand that goes in under my general objection?

"The Court: That is right.

"Q. Go ahead. A. They brought John Loy Storm out of the trailer and brought him around the south end.

"Mr. Leavitt: I would like to add the additional objection that the testimony of this witness is incompetent, improper and insufficient foundation laid to give any evidence as to the actions or attempt to describe the action of the dogs.

"Mr. Walsh: He is relating the physical facts as he observed them.

"Mr. Leavitt: Or attempt to give any conclusion as to what their actions were or were not.

"Mr. Walsh: We submit that at this time he is not testifying as to any conclusion.

"Mr. Leavitt: We object to this continual argument on our objections made under the rule of the court.

"The Court: The witness will be admonished not to give any conclusions as to what he saw.

"Mr. Leavitt: Exception to the court's ruling.

"Q. Just relate the facts of what actually occurred, give no conclusions of your own. A. Just what took place.

"Q. Just tell the court what took place, yes. A. Mr. Storm

come out of the trailer and stood in the road and the dogs run up to him and licked his hands, wagged their tails and sit down and looked at him.''

State highway patrolman Jack Marshall testified:

"A. The defendant, yes, came out of the trailer house and walked up to the—I would say to the south by the map there to where the dogs were at that time.

"Q. Would you indicate to the court and jury the actions of the dogs upon seeing Mr. Storm, John Loy Storm? A. As I recall they seemed very pleased, they immediately sniffed the ground where he was standing and jumped up on him, wagging their tails and seemed very happy to see him.

"Mr. Leavitt: In addition to the objection which has been heretofore interposed and to which the Court has granted an exception, the defendant moves to strike out the answer of the witness in relation to what the dogs did and that part of the testimony that the dogs seemed pleased for the reason that the same is a mere opinion of the witness, conclusion of the witness not based upon any qualification and therefore incompetent in the case.''

State highway patrolman Louis Alecksich testified:

"Q. You say Whitey went in and brought Mr. Storm out, is that right? A. Yes.

"Q. Would you describe the actions of the dogs at that time? A. Well after he was brought out of the trailer house they brought the dogs around to him and the dogs jumped up on him and started wagging their tails and licking him and Talbot says, 'That's your man.' ''

On his case the defendant Loy Storm testified: That on the afternoon of April 2nd he and his son were in their trailer house; that on looking out of the window to the east side of the trailer house he observed the bloodhounds coming up the road with a man holding them as they were walking along; that the sheriff appeared in the doorway,—ordered him to get his shoes on and then, taking him by the arm, guided him out to the road in front of the dogs. Defendant further testified that

"the man with the dogs eased up to me and I put my hand on one dog's head and I said, 'Nice dog,' and the man that had the dogs, he reached around and grabbed that arm and the dogs then moved up and smelt of my legs and the man with the bloodhounds turned to Dowlin and another man standing over on this side of me, Dowlin was over here (indicating), the other man standing here, I don't recall, he says, 'There's your man,' and people stood around there with their mouths open and he says, 'Well, you fellows just don't understand these hounds. When they find their man that's the end of the trail, there is nothing more.' "

To place the accused at the scene of the crime the state relied upon the so-called "bloodhound testimony." It alone placed him there.

Dogs and other dumb animals do not qualify as witnesses ▬ in the courts of this state. They know not the nature of an oath. They may not be sworn. They cannot be cross-examined. They testify only through professed interpreters whose translations and conclusions are always hearsay.

From about 10:00 o'clock p. m. on April 1st to about 3:30 o'clock p. m. on April 2nd the sheriff was off and on and in and about the Bean premises. During that time he and the coroner had made one complete round trip from the Bean home to the Storm trailer house and return. In the early morning of April 2nd, in his search for tracks the sheriff had walked over every part of the area later covered by the dogs. He, Spannagel and Clauson had walked from the Bean home to within a hundred yards of the trailer house and then retraced their steps back to the scene of the crime. Again the sheriff twice walked the same route when assisting Engineer Young in preparing the maps of the area. Next accompanied by Vern Handley and others the sheriff walked to within a hundred yards of the trailer house and then back to the Bean home. In making their "fish line tests,"—in measuring the distance from the bullet hole in the window to the floor and the distance from the south window to Track No. 1, the sheriff and Engineer Young were both walk-

ing about the window and in removing such window from the dwelling and placing it in his car, the sheriff added to his footsteps in that area. The dogs got their first sniff of the sheriff at about 2:30 o'clock p. m. on April 2nd upon their arrival in Forsyth. When they arrived at Finch some 30 minutes later the sheriff was there to give them their "starting point" at a spot and in an area that he had so recently walked over and anointed with his scent.

While some courts have admitted "bloodhound testimony" ▮ yet none have accepted it where, as here, after being given their initial scent and after running a portion of their course, the dogs were deliberately dragged off the scent by their handler,—taken down the state highway to a spot in a country lane and there given a fresh start and headed toward the trailer house of the accused wherein the sheriff was patiently awaiting the arrival of the captive dogs.

In State v. Brown, 103 S. C. 437, 88 S. E. 21, 23, L. R. A. 1916D, 1295, the court said:

"It is very manifest that, if reliance is had upon the instinct of the dogs, then that instinct must be free and untrammeled. In the case at bar the dogs wanted to enter the premises of Adam Brown, and were not permitted to do so. This control of the animal, that is supposed to have the instinct, by the man, who has not the instinct, destroys any value it may have as evidence, and all reference to the conduct of the dogs should have been stricken from the record." Compare: People v. Pfanschmidt, 262 Ill. 411, 104 N. E. 804, Ann. Cas. 1915D, 1171; State v. Norman, 153 N. C. 591, 68 S. E. 917; State v. Moore, 129 N. C. 494, 39 S. E. 626, 55 L. R. A. 96; Davis v. State, 46 Fla. 137, 35 So. 76; Ruse v. State, 186 Ind. 237, 115 N. E. 778, L. R. A. 1917E, 726.

In Brott v. State, 70 Neb. 395, 97 N. W. 593, 63 L. R. A. 789, a judgment of conviction was reversed, the court holding that the conduct and behavior of bloodhounds after being set upon the trail of the accused may not be given in evidence by the state for the purpose of proving that the scent of the accused

and the scent of the person who perpetrated the crime which is being investigated are identical. There the court said: ''The bloodhound has, of course, a great reputation for sagacity, and there is a prevalent belief that in the pursuit and discovery of fugitive criminals he is practically infallible. It is a commonly accepted notion that he will start from the place where a crime has been committed, follow for miles the track upon which he has been set, find the culprit, confront him, and *mirabile dictu,* by accusing bay and mien declare, 'Thou art the man.' This strange misbelief is with some people apparently incorrigible. It is a delusion which abundant actual experience has failed to dissipate. It lives on from generation to generation. It has still the attractiveness of a fresh creation. 'Time writes no wrinkle on its brow.' But it is nevertheless a delusion—an evident and obvious delusion. The sleuthhound of fiction is a marvelous dog, but we find nothing quite like him in real life. We repudiate utterly the suggestion that there is any common knowledge of the bloodhound's capacity for trailing which would justify us in accepting his conclusions as trustworthy under circumstances like those disclosed by the present record. The burglary was committed on the morning of July 5th, before daylight. The trailing did not commence until about 5 in the afternoon. In the meantime the trail, near the scene of the crime, had been walked over, closely paralleled, and crossed, directly and obliquely, perhaps, a hundred times. And the sun had been shining on it steadily for more than 12 hours. The situation the dogs had to deal with was an exceptionally difficult one, and it was, we think, reversible error to accept their conclusion as legal evidence of defendant's guilt. To get a nearer and clearer view of the nature of the evidence erroneously admitted, let us consider closely what trailing is. The path of every human being through the world, at every step, from the cradle to the grave, is strewn with the putrescent excretions of his body. This waste matter is in process of decomposition. It is being resolved into its constituent elements, and its power to make an impression on the olfactory nerves of a dog or other

animal becomes fainter and fainter with lapse of time. Under favorable conditions, such as free exposure to the air and sun, every compound particle is rapidly separated into its original parts, and, when the dissolution is complete its characteristic scent is gone. The bloodhound is endowed with a remarkably keen scent. He has great ability for differentiating smells. His method of trailing is simple and well understood. Particles of waste matter given off by a particular individual fall to the ground, and while undergoing chemical change come in contact with the olfactory nerves of the dog, and produce an impression which he is able to recognize, as distinct and different from all other impressions. Hence for a short time a man may be easily trailed in the woods or in the open country by the effluvia in his wake. But in a city, and after the lapse of considerable time, the trailing is obviously more difficult, and often manifestly impossible. But difficulties do not deter the bloodhound from pursuing his business. He trails as best he can. He always follows some scent, and he goes somewhere. Undoubtedly nice and delicate questions are time and again presented to him for decision. But the considerations that induced him in a particular case to adopt one conclusion rather than another cannot go to the jury. The jury cannot know whether the reasons on which he acted were good or bad; whether they were all on one side, or evenly balanced; or whether his faith in the identity of the scent which he followed was strong or weak. In attempting to separate one smell from ten, twenty, fifty, or a hundred similar smells with which it is intermixed and commingled, it is highly probable, if not quite certain, that the bloodhound undertakes a task altogether beyond his capacity. Like other dogs, he has his limitations, and they must be recognized in courts of justice, if not elsewhere. That the conclusions of the bloodhound are generally too unreliable to be accepted as evidence in either civil or criminal cases is, we believe, the teaching of that common knowledge and ordinary experience, which we may rightfully bring to the examination of this subject. If such evidence were held to be legal evidence, it would, standing

alone, sustain a conviction; and courts, in this golden age of enlightenment, would now and again be under the humiliating necessity of adjudging that some citizen be deprived of his property, his liberty, or his life, because, forsooth, within 24 or 40 hours after the commission of a crime, a certain dog indicated by his conduct that he believed the scent of some microscopic particles supposed to have been dropped by the perpetrator of the crime was identical with, or closely resembled, the scent of the person who had been accused and put upon trial. There are, we know, some cases in this country which hold that this kind of evidence is competent, but it seems the judicial history of the civilized world is against them. The bloodhound is, we admit, frequently right in his conclusions, but that he is frequently wrong is a fact well attested by experience. What he does in trailing may be regarded as the declaration of a disinterested party, but, so regarded, the authorities are opposed to its admission. It is unsafe evidence, and both reason and instinct condemn it.''

In Rex v. White, 37 B. C. 43, 3 (1926) D. L. R. 1, Chief Justice J. A. MacDonald said:

''I am apprehensive of the danger of admitting as evidence the inferences which a witness may draw from the actions of dogs under any circumstances. The rules of evidence evolved by judges in the course of centuries of experience in the elucidation of truth, were adopted with a view to the protection of innocence as well as of society. The aim of Courts and Legislatures has been to adopt or frame rules of evidence which will, as far as is humanly possible, promote certainty even at the risk of allowing some guilty men to escape punishment. This caution has led to the rejection of hearsay evidence, yet in a great majority of instances, such evidence would greatly aid in the attainment of justice. Nevertheless, the dangers of it led to its exclusion.

''The evidence admitted here is of the same character as hearsay and is, in my opinion, more objectionable and untrustworthy. .Let me state a parallel case: the natives of this Con-

tinent were noted for their ingenuity in the tracking, not only of game, but of their enemies. They were notable for their remarkable craft in that art. Let it be supposed that the most skilful of these was employed to track the murderer and that he had followed courses such as those taken by the dogs, and that thereafter he had communicated his observations and conclusions to another, but before the trial had died. Under our rules of evidence, that other could not be called as a witness to tell what the tracker had told him.

"One of the greatest safeguards against falsehood and error is cross-examination. Even that may fail at times to break down a false or mistaken witness, but its efficacy in general is recognized by all Courts. The Indian might have been cross-examined, had he lived and his testimony accepted for what it was worth, but that, by his death, having been rendered impossible, what he had told to another could not be given in evidence. The dogs, of course, could not have been cross-examined, yet their master was permitted to detail in the witness box what they by their actions had told him.

"Some examples were given by counsel of evidence, admittedly competent, and which was claimed to be analogous, i. e., handwriting, the results of chemical analysis, the information supplied by the clock, and the like, but these examples only go to show that the law does not always follow analogies. Such evidence, when admissible, is so because by the common experience of mankind its reliability has been ascertained. But that even the best trained dogs of a breed noted for acute sense of smell, will, with unerring instinct, pick up the scent of a criminal and not that of another, and by their actions tell a true story of the route taken by him, is not a fact of general acceptance. Nor can, I think, judicial notice be taken of a thing so vague and liable to be erroneous; neither can the evidence of a person professing to be an expert give it the semblance of dependable realty. It is not that I question the training and keen sense of smell of these dogs. I found my opinion on this; that the admission of such evidence, is at best akin to hearsay evidence,

and that apart from this, it ought, on principle, to be excluded on the ground that human life or liberty shall not be made to depend upon inferences to be drawn from the actions of dogs. The use of such dogs may be of assistance to the police to give them the cue to the identity of the offender, which, if obtained, may be followed up by conventional proof of guilt, but evidence of the actions of the dogs themselves should find no place in a Court of law.''

In his article entitled ''The Bloodhound as a Witness'', 54 Am. Law Review, 109, Judge J. C. McWhorter wrote:

''Human facilities of observation, memory, the ability accurately to describe what the mind perceives and the memory retains, are so imperfect, that scientists, after careful experiments, have found that the average man, in giving the details of what he sees and hears, is in error in more than fifty per cent of his statements. Inattention, lack of concentration, treacherous memory, bias, prejudice, animosity, friendship, or personal interest —any or all of these combined in a witness may render his testimony in a given case entirely unreliable, if courts and jurors could only know it. The most honest and conscientious man often does not know where his memory ceases and his imagination begins.

''Add to this the dishonesty of many men, the loose and careless habits of thought and speech of others, the misunderstandings of others, the mental limitations of others, the timidity, fear or embarrassment of still others, and one can readily see how unreliable, at best, human testimony is when based upon what witnesses have heard and seen and try to relate as remembered.

''It would seem, in the face of these well-known facts, that courts cannot be too careful in guarding the rights of litigants against these weaknesses and imperfections, especially where life or liberty is involved, and to keep out of trials, as far as reasonably possible, any character of testimony which may strongly tend to mislead juries, confuse the mind, arouse feelings of superstitious awe, or in any way warp the judgment. It

would seem that every canon of justice would require this. And yet, every dramatic play before a jury, every passionate appeal of counsel, represents an effort to substitute in the jury box emotion for reason, impulse and passion for sedate judgment, and to convert a jury of reasoning men into an irrational mob. * * *

"But one of the enigmas, if I may so term it, of modern practice in American courts—it seems to appear in none other—is the subjecting of life and liberty of human beings to the insidious danger and the caprice of that thing known as 'Bloodhound Testimony.' The admission in evidence of the statements of witnesses of what a bloodhound is supposed to have done in the way of tracking an accused party is a modern doctrine peculiar to American courts. Because of the superstitious awe in which such an animal is held by the average man, partly because of a lack of information as to its habits, traits and imperfections, and partly because of the mysterious and supernatural powers of smell and discrimination and the superior sagacity such animal is supposed to possess, such evidence, unless most carefully guarded, is insidiously dangerous and calculated to produce frightful miscarriages of justice. The very name of the animal, 'bloodhound,' carries with it a sense of terror and superstitious awe and admiration. The word 'blood,' in the breed's name is ordinarily supposed to indicate the blood-thirsty and vicious traits of the dog, such as cause him, when laid to an unfoiled trail of a human being, to hold to that particular trail, like an avenging Nemesis, with an unerring tenacity until the victim is run to earth and torn to pieces, no matter how many fresher trails of other human beings the dog may cross in the quest. The dog is supposed to have the mysterious power of distinguishing, with infallible accuracy, the particular smell of the particular individual traced, from all the other millions of smells the earth, with its teeming myriads of other human beings and animals, produces. * * *

"During the slavery days of America, the slave-holders of the south conceived the idea of employing dogs in tracking

slaves who attempted to escape. There were then no blood-hounds in America, and none were imported. But the common fox hound was trained to trail the slaves, and for the purpose of keeping the slaves awed and intimidated, the reports were generally circulated that these dogs were bloodhounds, with great accent on the word 'blood,' and that they were infallible, and when put on the trail of a negro would never abandon it until the fugitive was run down and torn to shreds, and that there was no escape from such ferocious dogs. This naturally appealed to the imaginative slave, and helped to give credence and circulation to these reports.

"But by and by the slaves began to learn that these hounds were harmless, and that all the reports concerning their vicious-ness were false, and the 'bloodhound' began to lose his terror. To offset this trouble, the common hound was then crossed with the Great Dane, or the Cuban Mastiff, both savage and vicious breeds of dogs, and a new strain produced called the 'Cuban Bloodhound,' and later and more appropriately called the 'Nig-ger Hound.' These dogs were vicious, and the former reports of the viciousness of the so-called 'bloodhounds' were renewed and fully credited, not only by the negroes but by the whites of both North and South as well. The vivid stories about these dogs in 'Uncle Tom's Cabin' had their counterparts in every slave-holding section of the country. These dogs could, with ease, track barefooted negroes through the swamps and low damp grounds of the South, and it was utterly immaterial whether the dog left an older trail for a fresher trail of another negro. Just so the dog 'treed a nigger,' the moral effect was the same. The slaves were kept intimidated, and these dogs were doing their work effectively, regardless of their accuracy.

"Thus this 'common knowledge' of the work of the 'blood-hounds' grew. These reports were exaggerated, and, without scruple, falsified and the sagacity, discriminating powers and deadly precision of these dogs magnified for the very purpose of keeping the slave terrified. In this there was eminent success.
\* \* \*

"But who would have dreamed at that time that these false and highly colored reports would become the basis for the promulgation of a doctrine by the courts of America that would put in deadly peril the lives and sacred liberties of American citizens?

"It will be observed that these dogs, from whose work this 'Common Knowledge' largely arose, or at least took its coloring, were not bloodhounds at all. They were, at best, only quarter bloods; and all these reports of the vicious character and deadly precision of the so-called 'bloodhounds' had their foundation in fact only to the extent that the blood of the Cuban Mastiff or the Great Dane had been infused into the strain. Such reports were not true of the English Bloodhound, and never were.

"If these facts had been thoroughly understood, I do not believe this insidiously dangerous 'bloodhound doctrine' would ever have been adopted by any of the American courts, and that when once fully understood, it will either be repudiated in toto, or so emasculated by precautionary restrictions as to render it harmless." Compare: State v. Moore, 129 N. C. 494, 39 S. E. 626, 55 L. R. A. 96.

In McClurg v. Brenton, 123 Iowa 368, 98 N. W. 881, 65 L. R. A. 519, 101 Am. St. Rep. 323, a judgment of conviction was reversed, the supreme court holding it to be error to admit, over objection, evidence as to the conduct of dogs used to trace an alleged chicken thief.

In Crosby v. Moriarty, 148 Minn. 201, 181 N. W. 199, the trial court excluded certain offered testimony describing the conduct of a dog when set out on human tracks found near a fire alleged to have been willfully set. The supreme court held that as there was no evidence tending to connect the tracks on which the dog was set with the person who set the fire nor anything to indicate that the tracks were not made by some of the many persons that flocked to the fire after the alarm was given that the foundation was insufficient to admit any testimony of the conduct of the dogs and when that testimony is examined it proves either that the dogs were worthless or

also the conditions were such that no clue to the incendiary could be obtained from the suspected tracks.

In State v. McLeod, 196 N. C. 542, 146 S. E. 409, 411, the state over defendant's objections, introduced evidence that certain English bloodhounds trained and accustomed to pursuing the human track and found by experience reliable in such pursuit were put upon certain tracks leading from where the body of the person murdered was discovered; that after following a long and circuitous route the hounds stopped within 20 or 30 feet of defendant's house where defendant, his father and mother and several small children were living and that when the defendant was brought out of the house the hounds did not bay or otherwise indicate defendant. The Supreme Court holding that the dog evidence was incompetent and its admission prejudicial error awarded a new trial saying:

"The incompetency of the evidence in the instant case lies in the fact that the action of the bloodhounds was such as to afford no reasonable inference of the identity of the prisoner as the guilty party.

"Nor can we safely say that this evidence is so palpably weak and uncertain as to render its admission harmless. There is no telling how far the prisoner's case was affected by it."

In State v. Grba, 196 Iowa 241, 194 N. W. 250, 259, the court said:

"All of the courts that admit such evidence concede that it is merely a circumstance and is 'of the weakest character.' If the bloodhound is infallible because of his animal instincts, then evidence of his conduct in tracing a human being would rather be of the highest character than 'merely a circumstance of the weakest character.' If invariable animal instinct guides him accurately in the matter, then his conduct in trailing an alleged criminal would be quite conclusive.

"It is conceded by all courts, and must be from the facts of the case, that the bloodhound is not infallible, that he does make mistakes, and that he does not invariably follow a trail without deflection therefrom and with absolute certainty. In

other words, the bloodhound may be right in what he does, and he may be wholly wrong. How is it possible to know in any particular case whether he is right or wrong?

"We are constrained to hold that the trial court committed error in the admission of this evidence and in submitting this question to the jury, and for that error the judgment of the district court must be, and it is, reversed." Compare: State v. Brown, 103 S. C. 437, 88 S. E. 21, L. R. A. 1916D, 1295; People v. Whitlock, 183 App. Div. 482, 171 N. Y. S. 109.

This cause is now before us on defendant's petition for rehearing. Never before has this court been asked to pass upon the competency or admissibility of so-called "bloodhound testimony". The arguments and briefs of counsel both on the appeal proper and upon the petition for rehearing have been carefully examined and considered and this court is now firmly convinced that the admission of the "bloodhound testimony" was highly improper constituting prejudicial error and a denial of substantial rights to which the accused was entitled.

Irrespective of the rule obtaining elsewhere, we here hold that in this jurisdiction such so-called "bloodhound testimony" is incompetent and inadmissible on the trial of any person accused of crime and it is so declared.

Every person charged with a crime, on his plea of not guilty has an absolute and fundamental right to a fair and impartial trial under and pursuant to the law of the government, the sovereignty of which he is accused of having offended and it is the duty of the courts to see that this most substantial and vital right is upheld and sustained.

Accordingly the majority opinion heretofore pronounced is ordered withdrawn and this opinion is ordered substituted therefor. It is further ordered that the judgment of the district court be and it is reversed and the cause is remanded for a new trial and further proceedings not inconsistent herewith. Remittitur will issue forthwith.

ASSOCIATE JUSTICES BOTTOMLY and FREEBOURN, concur.

MR. JUSTICE ANGSTMAN: (dissenting).

I think the judgment should be affirmed. In the majority opinion the facts are so embroidered around the edges and so embellished with unwarranted conclusions of the author as to make it appear that the bloodhounds were pursuing the sheriff instead of the defendant. A fair consideration of the evidence should dispel any such a conclusion.

Even astute counsel for the defendant did not so construe the evidence.

The dogs were placed on the scent at the point 49½ feet south of the window through which the bullet passed that caused the death of decedent.

This point was 2.9 feet below a direct line extended from the point where the bullet struck the stove through the hole in the window through which the bullet entered. This spot was carefully guarded and no one was permitted to touch it; south of this point and between the Bean house and the trailer house occupied by defendant, some 1,750 feet to the south and west, there were several human tracks found in the dirt headed in a southwesterly direction; these tracks were located the morning after the homicide; during the night two men were placed in charge of the premises and guarded it with flashlights; they testified that no persons traversed the area to the south of the house during that night; there was evidence that the defendant had made threats against the decedent, some of which were made on the day of the homicide; defendant and decedent had had some difficulty in connection with machinery which they used in jointly operating a ranch; defendant desired to either buy Bean's interest or to sell his interest to Bean, but was unable to reach any agreement with the decedent. There was also evidence that after the defendant was arrested and placed in jail he made a statement to one of the inmates in the jail that he got a gun and killed the decedent Bean; on the

afternoon of April 2nd the bloodhounds owned by Mr. Talbot of Hamilton, Montana, were placed upon the track which appeared to have been made by a person kneeling on the ground at the point 49½ feet south of the house; the bloodhounds turned about and started in a general direction south and southwest of the house and crossed the railroad tracks and highway No. 10 and proceeded from there further southwest to the trailer situated near the county road and which trailer was occupied by the defendant and his son; the hounds pursued the general course where the tracks of a human being were previously found; the dogs were diverted a few feet from the trail as it entered a small pot hole filled with cattails because it was easier walking, but the trail was picked up by the dogs on the opposite side of the pot hole from where the trail entered it; when the dogs reached the trailer the defendant was brought out of the trailer by the sheriff and the dogs exhibited a degree of friendliness for defendant, licking his hands and jumping upon him, which Mr. Talbot, the owner of the dogs testified they were taught to do when finding the persons they were trailing.

The courts are not in agreement as to the admissibility of so-called bloodhound evidence. The overwhelming weight of authority, however, holds that such evidence is admissible if there has been a proper foundation laid. The rule is stated in 20 Am. Jur., Evidence, section 362, page 331, as follows: ''Considerable uncertainty in the minds of the courts as to the reliability of dogs in identifying criminals and much conflict of opinion on the question of the admissibility of their actions in evidence have existed. A survey of the cases, however, reveals that most courts in which the question of the admissibility of evidence of trailing by bloodhounds has been presented take the position that, upon a proper foundation being laid by proof that the dogs were qualified to trail human beings and that the circumstances surrounding the trailing were such as to make it probable that the person trailed was the guilty party, such evidence is admissible and may be permitted to go to the jury for what it is

worth as one of the circumstances which may tend to connect the defendant with the crime." See also, 22 C. J. S., Criminal Law, sec. 646, p. 988; Annotations in 94 A. L. R. 413, 42 L. R. A. 432, 35 L. R. A., N. S., 870, and L. R. A. 1917E, 730, and 1 Wharton's Criminal Evidence, 11th Ed., sec. 380, p. 602.

Since the above annotations, one other state has joined the majority. That was done by Oklahoma in the case of Buck v. State, 77 Okl. Cr. 17, 138 Pac. (2d) 115. The majority view therefore is supported by courts in the following states: Alabama, Arkansas, Florida, Kansas, Kentucky, North Carolina, South Carolina, Missouri, Ohio, Pennsylvania, Tennessee, Texas, Mississippi, Georgia, West Virginia, Louisiana and Oklahoma. The following cases reported since the annotation in 94 A. L. R., and perhaps others, have recognized the majority rule as being the correct one when proper foundation has been laid: Moore v. State, 1937, 26 Ala. App. 607, 164 So. 761; Orr v. State, 1938, 236 Ala. 462, 183 So. 445; Burks v. State, 1941, 240 Ala. 587, 200 So. 418; Rolen v. State, 191 Ark. 1120, 89 S. W. (2d) 614; Tomlinson v. State, 1937, 129 Fla. 658, 176 So. 543; Schell v. State, 1945, 72 Ga. App. 804, 35 S. E. (2d) 325; Mitchell v. State, 1948, 202 Ga. 247, 42 S. E. (2d) 767; State v. Lee, 211 N. C. 326, 190 S. E. 234; Kelly v. Commonwealth, 259 Ky. 770, 83 S. W. (2d) 489; Brummett v. Commonwealth, 1936, 263 Ky. 460, 92 S. W. (2d) 787; Short v. Commonwealth, 1942, 291 Ky. 604, 165 S. W. (2d) 177; Daugherty v. Commonwealth, 1943, 293 Ky. 147, 168 S. W. (2d) 564; Hinton v. State, 175 Miss. 308, 166 So. 762; State v. Green, 1946, 210 La. 157, 26 So. (2d) 487; and State v. Long, 336 Mo. 630, 80 S. W. (2d) 154.

Four states and British Columbia hold that such evidence is inadmissible but in some of them the cases are distinguishable. The case of Brott v. State, 70 Neb. 395, 97 N. W. 593, 63 L. R. A. 789, is usually cited as sustaining the minority view. Actually, however, the court indicated that for a proper purpose and under facts such as we have here, the evidence may be received, but rejected it in that case because it was sought by such evi-

dence to prove independent crimes and this without corroboration. The court in that case said: "The conduct of the dogs was, perhaps, rightly received, in connection with an admission made by Brott, as evidence tending to prove that he committed the crime charged in the information; but it was also received as proof of independent crimes which the state brought to the attention of the jury, and to which the admission did not relate."

The case of People v. Pfanschmidt, 262 Ill. 411, 104 N. E. 804, Ann. Cas. 1915A, is a leading case adopting the minority view. That was a case in which the dog was tracking a horse rather than a human being. The dog was not permitted to stay on the trail at all times but simply worked the crossroads; between the crossroads the dog was permitted to ride in an automobile. The court, however, in that case by way of dictum said that it would not consider bloodhound testimony in any case.

Indiana is another state relied upon as supporting the minority view. In the case of Stout v. State, 174 Ind. 395, 92 N. E. 161, Ann. Cas. 1912D, 37, the court rejected such evidence. The evidence was not offered, however, by the state but the defendant sought to show that the bloodhound trailed another person from the scene of the crime. The court held that this was inadmissible but indicated that if the defendant could or had offered other evidence to prove the guilt of the third person then the evidence might have been admissible.

In re Rex v. White, 37 British Columbia Law Reporter 43, such evidence was held inadmissible in a three to two opinion. The state of Iowa has gone both ways on the question. McClurg v. Brenton, 123 Iowa 368, 98 N. W. 881, 65 L. R. A. 519, 101 Am. St. Rep. 323; State v. Grba, 196 Iowa 241, 194 N. W. 250.

As to the character of the foundation that must be laid, the rule was well stated in Peigo v. Commonwealth, 103 Ky. 41, 44 S. W. 143, 145, 42 L. R. A. 432, 82 Am. St. Rep. 566, as follows: "After a careful consideration of this case by the whole court, we think it may be safely laid down that, in order to make such testimony competent, even when it is shown that the dog is of pure blood, and of a stock characterized by acuteness of

scent and power of discrimination, it must also be established that the dog in question is possessed of these qualities, and has been trained or tested in their exercise in the tracking of human beings, and that these facts must appear from the testimony of some person who has personal knowledge thereof. We think it must also appear that the dog so trained and tested was laid on the trail, whether visible or not, concerning which testimony has been admitted, at a point where the circumstances tend clearly to show that the guilty party had been, or upon a track which such circumstances indicated to have been made by him. When so indicated, testimony as to trailing by a bloodhound may be permitted to go to the jury for what it is worth, as one of the circumstances which may tend to connect the defendant with the crime of which he is accused." To the same general effect are: Buck v. State, supra, and State v. Adams, 85 Kan. 435, 116 Pac. 608, 35 L. R. A., N. S., 870.

Here the foundation testimony was produced before the court without the presence of the jury. It consisted briefly of the following: George Talbot was produced as a witness who showed by his testimony that he purchased the two bloodhounds in question when they were about seven weeks of age; they were certified by the American Kennel Association; he had used the dogs for the following of human scents and lost persons ever since they were two months old; they had run on the average of three times a week; they have been put upon tracks after they were 40 hours old and followed them successfully; the dogs are the official dogs of the Lost Persons Foundation; Mr. Talbot explained in detail the manner and method of training the dogs; the result of the training of these dogs established for them an almost perfect record; he said they seldom see the person upon whose tracks they are laid; they have been trained so they can follow a trail even though it has been crisscrossed by other persons for the purpose of misleading them; the dogs in the past two years have been placed upon the trail of not less than 35 lost persons and found the persons in every instance, except when the person ceased to make a trail by getting into

an automobile; he said that the bloodhounds trail by scent and that the tracks mean nothing to them; if the track of a lost person or man which they are hunting crisscrosses, the dog follows the hottest scent; on the afternoon of April 2nd he was careful to hold the heads of the dogs in the air by means of a leash until he reached the point where he desired to place them upon the trail; he placed them upon the trail at the point which had been carefully guarded, 49½ feet south of the window, marked D on the state's exhibit 2; as he did so, the dogs were facing the house and as soon as they obtained the scent they immediately swung around and started in a direction away from the house, following the general course of the tracks above referred to.

The evidence shows in detail how the dogs followed the general course to the trailer house occupied by the defendant some 1750 feet from the Bean house. The dogs are trained so that when they find the person whom they are tracking, they look for their reward in the way of food and exhibit pleasure and a liking for such person. They did this in the instance in question by jumping upon the defendant, licking his hands, wagging their tails, and manifesting their pleasure generally. Defendant attempted to explain the attitude of the dogs by testifying that he patted one of the dogs and said, "Nice dog," but no other witness who was present corroborated him in that respect. It is clear, however, that if he did pat one of the dogs, it was after they had exhibited a friendliness to him. It was shown that Mr. Talbot has no financial interest in the use of the dogs in a criminal case. He was simply paid his expenses and the expenses of his dogs in making the trip from Hamilton to Forsyth. The court, after hearing this evidence, determined that it was admissible. It was then repeated in the presence of the jury.

The suggestion that the dogs were supposed to have obtained the scent of the murderer somewhere in the area nearer the window than point D and where other people may have been prior to the arrival of the dogs is not justified by the record.

Mr. Talbot testified that when he arrived at the Bean house

with the sheriff he went over to see what they had for the dogs to start on. He was shown the point which was marked D on state's exhibit 2. He then went back to the car and "got the two dogs and brought them out with their heads high and dropped them on the track going towards the house or towards the window." He further testified:

"Q. * * * Can you now start, go at the point where you lowered the dogs to the point D on the State's Exhibit 2, in detail please and describe exactly what course, of conduct, just exactly what those dogs did from the very moment that you dropped them on the scent at that point?

"The Court: What do you mean, Mr. Haynes, by dropping or lowering? Mr. Haynes: I mean taking the dogs as I have understood the witness and I wish to be promptly corrected if I have misunderstood it; I have understood that when the dogs, the two bloodhounds, came out of the car that habitually as they were trained that he kept their heads up away from the ground and took them over to the point D where the scent was to begin as indicated to him by the Sheriff Dowlin and at that point dropped them on the scent or on the track. Now am I right, is that what you did? A. That is right.

"The Court: What way do you mean? Mr. Haynes: I certainly don't mean throw up, I mean he dropped them. Mr. Leavitt: He means he laid them on it, he laid them on the scent.

"Q. You laid them on the scent, is that right? A. I turned loose of them and I put their heads down. Mr. Haynes: Is that more satisfactory to Your Honor? Well then you may strike drop and put in turned them loose.

"Q. All right then Mr. Talbot, will you go ahead now and in detail describe the conduct of those dogs from that moment when you turned them loose on that track? A. Well they started right in trailing when I brought them out I dropped—

"Q. Use your own words. A. I dropped their heads on this scent or just a little ahead of where the mark was so that there wouldn't be no confusion if somebody had walked in back to take a look, I dropped them a little bit farther towards the

window on the track and from that they was headed towards the house and then they swung right around and come back and come through the fence or across a little field there. * * *"

It is clear to me that if there were any deviation in the starting point from the point marked D on exhibit 2, the same being what appeared to be where a person had kneeled, it was merely a matter of inches and that there is no real basis for the suggestion that the dogs picked up the scent somewhere other than from the point marked D on the exhibit or some other scent than that of the person who made the impression in the ground at point D.

It is my view that this evidence is admissible as a circumstance tending to show that defendant was at the scene of the crime, at or about the time the crime was committed. Standing alone, of course, this evidence is not sufficient to prove the guilt of defendant, but as above pointed out, there was ample other evidence including the positive admission of the defendant tending to connect him with the commission of the crime.

The purpose of such evidence was well stated by the Supreme Court of Kentucky in Blair v. Commonwealth, 181 Ky. 218, 204 S. W. 67, 68, as follows: "The evidence of the acts of bloodhounds in following a trail may be received merely as circumstantial or corroborative evidence against a person towards whom other circumstances point as being guilty of the commission of the crime charged.

"The admission of this class of evidence is therefore hedged about with abundant safeguards in the way of other and human testimony; and as long as these rules are adhered to bloodhound evidence is no more dangerous than any other class of circumstantial evidence."

It is an erroneous notion to regard the hounds as witnesses. State v. Davis, 154 La. 295, 97 So. 449; State v. Brown, 103 S. C. 437, 88 S. E. 21, L. R. A. 1916D, 1295. It is their actions that are admissible in evidence as a circumstance to be considered by the jury. The witness is the trainer of the dogs and defendant's constitutional rights are protected and preserved by the right to cross-examine the owner and trainer of the dogs. State

v. Davis, supra; State v. Dickerson, 77 Ohio St. 34, 82 N. E. 969, 13 L. R. A., N. S., 341, 122 Am. St. Rep. 479, 11 Ann. Cas. 1181.

The situation is analogous to the well-known fact that a ewe sheep will reveal by her actions which one out of many hundred lambs all identical in appearance, is her offspring, absent as here any showing that deception was practiced upon her. Compare: I Wigmore on Evidence, 3rd Ed., sec. 177, p. 633; and State v. Grimsley, 96 Mont. 327, 30 Pac. (2d) 85.

The argument that dogs are not infallible is beside the point. As above noted it is the trainer who is the witness and not the dogs. If fallibility is to be made the test of admissibility of evidence, then our system of trials must undergo a drastic change.

One other circumstance in connection with this evidence should be noted. One witness testified that as the dogs demonstrated an apparent interest in the defendant, Mr. Talbot said: "That's your man." Obviously that was but the conclusion of Mr. Talbot and had timely objection been made it should have been excluded. But here there was but a general objection to all evidence of the action of the bloodhounds and a motion to strike all the evidence relating thereto.

There was no specific objection to the three words above quoted. There was no motion to strike these specific words except as they were included in the scope of the general motion to strike all of the evidence relating to the action of the bloodhounds.

In Patterson v. State, 191 Ala. 16, 67 So. 997, 998, the court said: "It is manifest that at least parts of the stenographic report were relevant and admissible under the familiar rule for impeaching a witness by showing statements, previously made, contradictory of testimony he has given on the hearing or investigation in progress. Those parts of the stenographic report which tended to contradict the testimony given by the defendants on the trial were admissible. The objection was addressed to the whole of the report offered. If any part of it was admissible, then the objection was due to be overruled. Hill v.

State, 146 Ala. 51, 41 South. 621; Longmire v. State, 130 Ala. 66, 30 South. 413. There was no duty on the court to separate the admissible parts of the report from the inadmissible.''

In Timberman v. State, 107 Ohio St. 261, 140 N. E. 753, 754, the same question was considered as relating to an objection to certain evidence, a part of which was inadmissible and a part admissible. The court said: ''However, the objection taken to this question was general only. No application was made to strike out this particular sentence. Part of the question was entirely competent, and only the one sentence italicized above was objectionable. It was the duty of the attorney for the defendant to make specific objection to incompetent testimony in order properly to raise the question before the trial court. Since that was not done, the testimony must be considered as if no objection stood upon the record.'' Other cases taking the same view are: St. Louis, I. M. & S. Ry. Co. v. Hendricks, 48 Ark. 177, 2 S. W. 783; Brown v. Mitchell, 88 Tex. 350, 31 S. W. 621, 36 L. R. A. 64; State v. Lasecki, 90 Ohio St. 10, 106 N. E. 660, L. R. A. 1915E, 202; Wehrle v. General Motors Corp., Ohio App., 80 N. E. (2d) 702; Gutzman v. Clancy, 114 Wis. 589, 90 N. W. 1081, 58 L. R. A. 744; Carmichael v. Southern Bell Tel. & Tel. Co., 162 N. C. 333, 78 S. E. 507. And see 53 Am. Jur., ''Trial'' sec. 140, p. 124.

I think the court properly admitted the evidence of the action of the bloodhounds.

The majority opinion holds that it was error to permit the state to introduce in evidence plaster casts of the footprints found near the scene of the crime and that it was error to receive in evidence new overshoes which defendant placed on his feet and compared with the plaster casts of the footprints. It is suggested that there was no proof that defendant made the footprints. There was evidence that defendant made the statement that he shot the deceased. It is clear that whoever shot deceased must have made some tracks south of the house where the shooting occurred; facts may be shown by circumstantial evidence.

The general rule governing this question is stated in 20 Am.

Jur., Evidence, sec. 360, p. 330, as follows: "A witness may testify in a criminal prosecution as to human tracks found upon the ground at the place of a crime and as to their size, location, or any peculiarity that he may have observed about them. Similarly, the description and measurements of tracks at the scene of a crime, which correspond with the shoes worn by the defendant and have been introduced in evidence, are competent."

The court in State v. Fuller, 34 Mont. 12, 85 Pac. 369, 372, 8 L. R. A., N. S., 762, declared: "There can be no controversy as to the general rule that footprints or other marks or tokens found upon or near the place of the crime may be admitted to connect the accused with it and identify him as the guilty person, if the evidence tends to show that he left such evidences behind him."

This was merely a means of giving the description and size of the tracks for comparative purposes which is proper. The fact that the overshoes may and doubtless would fit many persons simply goes to the weight of the evidence. Were we to say that this species of evidence was inadmissible, I think its admission was harmless error. It seems unbelievable that any juror would have been influenced to find defendant guilty of murder because of the introduction of the overshoes or plaster casts in evidence. It should be noted too that defendant made no objection to the procedure adopted, by having him put the overshoes on in the presence of the jury, and to the testimony given by him that they fit him, nor was there any objection made to the testimony and the demonstration made that the overshoes fit the plaster cast of the tracks. The only objection made was to the introduction of the overshoes themselves after these comparisons had been made and the general motion to strike the evidence long after it had gone in without objection. The defendant himself did not testify that the overshoe did not fit the plaster cast.

The record shows the following:

"Q. Very well, now I hand you one of the overshoes, State's Exhibit No. 34 and ask you to fit it and to fit it to State's

Exhibit No. 10 as to the heel and see what you find. (Witness putting overshoe on cast) A. Similar.

''Q. Seems to fit, doesn't it? A. Well did you have any trouble, Mr. Haynes, of finding a pair of overshoes that would fit those tracks?''

No objection was made by defendant to this comparison upon which he could predicate prejudicial error as found in the majority opinion.

If the overshoe does not fit the plaster cast as the majority opinion states (which I do not concede) then that fact was as obvious to the jury as to the members of this court and I think it is rather far fetched to conclude that any right of defendant was prejudiced by the admission of such evidence even if it should have been excluded.

I think the judgment should be affirmed.

MR. JUSTICE METCALF:

I concur in the foregoing dissenting opinion of Mr. Justice Angstman.